# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| BLUE SPIKE LLC, | § | |
| BLUE SPIKE INTERNATIONAL LTD., | § | |
| and WISTARIA TRADING LTD., | § | |
| | § | CIVIL ACTION NO. 4:20-CV-671 |
| v. | § | (Judge Mazzant) |
| | § | |
| GRANDE COMMUNICATIONS INC. and | § | |
| GRANDE COMMUNICATIONS | § | |
| NETWORKS, LLC | § | |

## AMENDED CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs Blue Spike LLC, Blue Spike International Ltd., and Wistaria Trading Ltd.'s ("Plaintiffs'" or "Blue Spike's") Opening Claim Construction Brief (Dkt. #37), Defendants Grande Communications Inc. and Grande Communications Networks, LLC's ("Defendants'" or "Grande's") Responsive Claim Construction Brief (Dkt. #39), and Plaintiffs' Reply Claim Construction Brief (Dkt. #40).  Also before the Court are the parties' July 19, 2021 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. #30) and the parties' September 24, 2021 Joint Claim Construction Chart (Dkt. #41-1).

The Court held a claim construction hearing on October 20, 2021, to determine the proper construction of the disputed claim terms in United States Patents No. 7,475,246, 8,224,705, 8,473,746, 8,739,295, 9,021,602, 9,104,842, RE44,222, and RE44,307.

The Court issues this Claim Construction Memorandum Opinion and Order and hereby incorporates-by-reference the claim construction hearing and transcript as well as the parties' demonstrative slides presented during the hearing.  Also, as to constructions suggested by the Court during the hearing, the Court provided an opportunity for the parties to file any additional objections after the hearing, and no additional objections were raised.  (Dkt. # 48; Dkt. #49).

Table of Contents

**BACKGROUND** ........................................................................................................... **4**

**LEGAL STANDARDS** ............................................................................................... **5**

**ANALYSIS** ................................................................................................................. **9**

  1. "watermarked packet(s)" .................................................................................... 9

  2. "packet watermark" ......................................................................................... 12

  3. "packet watermark indicates the integrity of at least one of the plurality of packets" ........ 15

  4. "stream of data" .............................................................................................. 17

  5. "packet(s)" ...................................................................................................... 19

  6.  "combining (using a processor), the packet watermark with each of the plurality of packets to form watermarked packets" ........................................................... 21

  7. "packet flow" .................................................................................................. 25

  8. "provisioning" ................................................................................................. 26

  9. "organizing the stream of data into a packet flow comprising a plurality of packets" ........ 29

  10. "associated with the packet flow" ................................................................. 31

  11. "watermark packet key" ................................................................................ 33

  12. "unique identifier" ......................................................................................... 35

  13. "wherein said packet content is less than all data of a data object" ................... 36

  14. "data object" ................................................................................................. 38

  15. "WID (Watermark Identification)" ................................................................ 40

  16. "agreed upon purchase value" ...................................................................... 42

  17. "the purchaser's account" ............................................................................. 45

  18.  "causing a debit to the purchaser's account in an amount of bandwidth usage which corresponds to the agreed upon purchase value" ............................................ 47

  19.  "a processor applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification)" ....................................... 49

  20. "packet watermark protocol" ....................................................................... 53

  21. "a vending system" ....................................................................................... 56

  22. "a purchasing system" .................................................................................. 58

  23. "application software" .................................................................................. 61

  24. "a license code" ............................................................................................ 63

  25. "decoding key" ............................................................................................. 65

  26. "configuration information" ......................................................................... 68

27. "personalization data resource" ........................................................................ 70

28. "encoded code resource" ................................................................................... 72

29. "A computer based method for accessing functionality provided by an application software" .......................................................................................................... 74

30. "software product" ............................................................................................ 76

31. "license information" ......................................................................................... 77

32. "a routine designed to decode a first license code encoded in said software product" ..... 80

33. "LCS domain" .................................................................................................... 83

34. "devices outside [an] LCS" ................................................................................ 85

35. "content data set" .............................................................................................. 87

36. "legacy" and "legacy content" .......................................................................... 89

37. "identification associated with a prompt" ......................................................... 91

38. "quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy" .......................................................... 93

39. "first data set status value of said first data set to be at least one of unsecure, secure, and legacy" ............................................................................................... 96

40. "Secure Electronic Content Distributor (SECD)" ........................................... 98

41. "secured transmission" .................................................................................... 100

42. "said predetermined quality level having been set for legacy content" ......................... 102

43. "said LCS determining, at least in part from rights associated with an identification associated with a prompt received by said LCS for said first content, a quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy" ................................................................................ 104

44. "domain processor" .......................................................................................... 106

45. "domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS" ......................................... 110

46. "said LCS domain processor determining, from said first data set, a first data set status value of said first data set to be at least one of unsecure, secure, and legacy" ................. 112

**CONCLUSION** .................................................................................................... **113**

## BACKGROUND

Plaintiffs allege infringement of United States Patents No. 7,475,246, 8,224,705, 8,473,746, 8,739,295, 9,021,602, 9,104,842, RE44,222, and RE44,307 (Dkt. #39, Exs. 1–8).[1] The patents-in-suit relate to sending data over a network and protection of digital information.

The parties submit that the patents at issue in these claim construction proceedings include three groups of patents: the "Packet Transfer" Patents (the '222 Patent, the '307 Patent, the '746 Patent, and the '705 Patent); the "Watermarking" Patents (the '602 Patent and the '842 Patent); and the "Secure Server" Patents (the '295 Patent and the '246 Patent).

The Packet Transfer Patents include the '222 Patent, titled "Methods, Systems and Devices for Packet Watermarking and Efficient Provisioning of Bandwidth," which issued on May 14, 2013, and bears an earliest priority date of April 17, 2002.  The Abstract of the '222 Patent states:

> Disclosed herein are methods and systems for transmitting streams of data.  The present invention also relates to generating packet watermarks and packet watermark keys.  The present invention also relates to a computerized system for packaging data for transmission to a user.  The system may utilize computer code to generate a bandwidth rights certificate that may include: at least one cryptographic credential; routing information for the transmission; and, optionally, a digital signature of a certificate owner; a unique identification code of a certificate owner; a certificate validity period; and pricing information for use of bandwidth.  The present invention also relates to an electronic method and system for purchasing good [*sic*] and services by establishing an account whereby a customer is credited with a predetermined amount of bandwidth usage, and then charges are assessed against the account in an amount of bandwidth usage which corresponds to the agreed upon purchase value for the selected item.

The Watermarking Patents include the '602 Patent, titled "Data Protection Method and Device," which issued on April 28, 2015, and bears an earliest priority date of March 24, 1998. The Abstract of the '602 Patent states:

---

[1] "Plaintiff is withdrawing its assertion as to all claims of United States Patents No. 7,159,116 and 8,538,011."  (Dkt. #37, at p. 1).

An apparatus and method for encoding and decoding additional information into a digital information in an integral manner.  More particularly, the invention relates to a method and device for data protection.

The Secure Server Patents include the '295 Patent, titled "Secure Personal Content Server," which issued on May 27, 2014, and bears an earliest priority date of August 4, 1999.

The Abstract of the '295 Patent states:

> A local content server system (LCS) for creating a secure environment for digital content is disclosed, which system comprises: a communications port in communication for connecting the LCS via a network to at least one Secure Electronic Content Distributor (SECD), which SECD is capable of storing a plurality of data sets, is capable of receiving a request to transfer at least one content data set, and is capable of transmitting the at least one content data set in a secured transmission; a rewritable storage medium whereby content received from outside the LCS may be stored and retrieved; a domain processor that imposes rules and procedures for content being transferred between the LCS and devices outside the LCS; and a programmable address module which can be programmed with an identification code uniquely associated with the LCS.  The LCS is provided with rules and procedures for accepting and transmitting content data.

## LEGAL STANDARDS

Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  The purpose of claim construction is to resolve the meanings and technical scope of claim terms.  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  When the parties dispute the scope of a claim term, "it is the court's duty to resolve it."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad*

*Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1312–13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.*  Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent."  *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance.  *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope.  *Phillips*, 415 F.3d at 1316.  Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001).  This presumption does not arise when the patentee acts as his own lexicographer.  *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.  For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc. v. Elan Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics*, 90 F.3d at 1583).  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent.  *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."  *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (quotation omitted).  "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution."  *Omega Eng'g*, 334 F.3d at 1324.  However, the prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation

during prosecution to obtain claim allowance.  *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002).  Statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal."  *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003).  An "ambiguous disavowal" will not suffice.  *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) (citation omitted).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art."  *Phillips*, 415 F.3d at 1317 (quotation omitted).  Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful."  *Id.*  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).  "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134

S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

**ANALYSIS**

*Agreed Claim Terms*

In their July 19, 2021 P.R. 4-3 Joint Claim Construction and Prehearing Statement and their September 24, 2021 P.R. 4-5(d) Joint Claim Construction Chart, the parties submit they have agreed that the term "packet content" in Claim 9 of the '746 Patent means: "Data that is not part of the packet header." (Dkt. #30, at p. 1; *id.*, Ex. A, at p. 3; Dkt. #41-1, at p. 18).

*Disputed Claim Terms*

At the October 20, 2021 hearing, the parties addressed substantially all of the disputed terms in their oral arguments. Below, the Court in some instances refers to certain positions and arguments presented by the parties during the hearing, but all arguments as to all disputed terms can be found in the hearing transcript, which as noted above is incorporated herein by reference.

### 1. "watermarked packet(s)"

| **"watermarked packet(s)"** ('222 Patent, Claim 1; '307 Patent, Claims 1, 6; '746 Patent, Claims 9, 10; '705 Patent, Claim 8) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| A packet that includes a packet watermark. | A packet that has been modified to include a packet watermark. |

(Dkt. #30, Ex. A, at p. 2; Dkt. #41-1, at pp. 7–8).

### A. The Parties' Positions

Plaintiffs argue "[n]o definition of 'watermarked packet(s)' is provided within the claims themselves or within the specification that requires 'modification' of a packet," and "[t]he

Applicant did not disclaim any portion of 'watermarked packet(s)' in prosecution."  (Dkt. #37, at p. 4).

Defendants respond that Plaintiffs "ignore[] controlling portions of the prosecution history," and Defendants argue that their proposed construction "is a near verbatim recital of Patentee's *own statement* during prosecution."  (Dkt. #39, at p. 4).

Plaintiffs reply that "[n]o modification of a packet is required to include such a packet watermark, and no definition was disclaimed during prosecution."  (Dkt. #40, at p. 1).  Plaintiffs also cite their arguments as to the term "packet watermark," which is a term discussed separately below.  (*Id.*).

At the October 20, 2021 hearing, Plaintiffs expressed concern that Defendants' proposed construction might be interpreted to require that a packet must exist before it is then "modified." Plaintiffs argued that, in the context of the claimed inventions, a packet need not first exist before a watermark is applied because, instead, a watermark could be introduced during packet creation (such that the resulting packet is "modified" in relation to what the packet would have been if a watermark had not been introduced).  Plaintiffs also noted that not all claims recite a "combining" limitation.  Defendants responded that "watermarked" packets are packets that existed without the watermark and then were changed by a watermark.  That is, Defendants argued that the disputed term requires modification of an existing packet rather than merely including a watermark as part of creating a packet.

### B.  Analysis

Defendants rely on prosecution history of the '222 Patent in which the patentee responded to an indefiniteness rejection as follows:

> Contrary to the Examiner's assertion that "packet watermark" is indefinite[,] Applicant respectfully disagrees and affirms that the term is understood by one

possessing ordinary skill in the art.  A "packet watermark" is an association with a "stream of data".  A "packet watermark" *modifies* packets in a manner that enables robust identification of the contents or integrity of the packet and/or data stream, as is amply presented in the Specification.  Because this is made clear in at least the Abstract; Background; Summary of the Invention; Detailed Description; and, in the original claims, Applicant respectfully requests the rejection be withdrawn.

(Dkt. #39, Ex. 9, Nov. 5, 2008 Amendment/Reply, at p. 6) (emphasis added).

Defendants' proposal of requiring modification of an existing packet is consistent with the context in which the term "watermarked packet" is used in *some* of the claims.  Claim 1 of the '222 Patent, for example, recites (emphasis added):

> 1.  A process for transmitting a stream of data, comprising:
>      receiving a stream of data;
>      organizing the stream of data into a plurality of packets;
>      generating a packet watermark associated with the stream of data wherein the packet watermark indicates the integrity of at least one of the plurality of packets;
>      *combining the packet watermark with each of the plurality of packets to form watermarked packets*; and
>      transmitting at least one of the watermarked packets across a network.

This recital of "combining" the watermark with each packet to thereby form "watermarked packets" is consistent with Defendants' proposal that a "watermarked packet" does not merely include a watermark but rather has been *modified* to include a watermark. Claim 1 of the '307 Patent and Claim 8 of the '705 Patent are similar in this regard.

Claim 9 of the '746 Patent, however, does not recite "combining," so to the extent Defendants' proposal of "modified" would require changing an existing packet, Defendants' proposal is not compelled by the claim language.  Further, although Plaintiffs have not challenged Defendants' position that the above-reproduced prosecution history applies to all four of the patents here at issue, Defendants do not persuasively show that the patentee used the word "modifies" so as to require changing an existing packet.  Instead, as Plaintiffs argued at the

October 20, 2021 hearing, the patentee's use of "modifies" in the above-reproduced prosecution history can be fairly understood as encompassing the creation of a packet so as to be different than it would have otherwise been.

The Court therefore hereby construes **"watermarked packet(s)"** to mean **"a packet that includes a packet watermark."**

2. **"packet watermark"**

| **"packet watermark"** <br> ('222 Patent, Claim 1; '307 Patent, Claims 1, 6; <br> '746 Patent, Claims 9, 10, 12; '705 Patent, Claim 8) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Data that includes an identifier associated with a data stream. | An association with a stream of data that modifies packets in a manner that enables robust identification of the packet contents (see "packet contents" construction) or integrity of the packet. |

(Dkt. #30, Ex. A, at p. 2; Dkt. #41-1, at p. 11).

### A. The Parties' Positions

Plaintiffs argue that "Defendants' proposal overreaches by importing functional language from the record into the claim language."  (Dkt. #37, at p. 6).

Defendants respond that "Blue Spike intentionally disregards controlling statements in the prosecution history that unambiguously define the term 'packet watermark.'"  (Dkt. #39, at pp. 4–5).

Plaintiffs reply that "the inventor explicitly defined what a packet watermark *is* . . . in one sentence and articulated its advantages over the prior art . . . in the next."  (Dkt. #40, at p. 1).

At the October 20, 2021 hearing, the Court proposed construing this disputed term to mean "packet modification that enables robust identification of the contents or integrity of the packet and/or data stream."   Defendants agreed with the Court's proposed construction. Plaintiffs disagreed.

### B.  Analysis

Claim 1 of the '222 Patent, for example, recites (emphasis added):

1.  A process for transmitting a stream of data, comprising:
    receiving a stream of data;
    organizing the stream of data into a plurality of packets;
    generating a *packet watermark* associated with the stream of data wherein the *packet watermark* indicates the integrity of at least one of the plurality of packets;
    combining the packet watermark with each of the plurality of packets to form watermarked packets; and
    transmitting at least one of the watermarked packets across a network.

Here again, Defendants rely on prosecution history of the '222 Patent in which the patentee responded to an indefiniteness rejection as follows:

> Contrary to the Examiner's assertion that "packet watermark" is indefinite[,] Applicant respectfully disagrees and affirms that the term is understood by one possessing ordinary skill in the art.  *A "packet watermark" is an association with a "stream of data".*  A "packet watermark" modifies packets in a manner that *enables robust identification of the contents or integrity of the packet and/or data stream*, as is amply presented in the Specification.  Because this is made clear in at least the Abstract; Background; Summary of the Invention; Detailed Description; and, in the original claims, Applicant respectfully requests the rejection be withdrawn.

(Dkt. #39, Ex. 9, Nov. 5, 2008 Amendment/Reply, at p. 6) (emphasis added).

These statements by the patentee are definitive, and the use of quotation marks around the term "packet watermark" reinforces that this portion of the prosecution history sets forth a definition.  *See Home Diagnostics*, 381 F.3d at 1356 ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."); *see also Sinorgchem Co.,*

*Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) ("[t]he term . . . is set off by quotation marks—often a strong indication that what follows is a definition").  Finally, Plaintiffs have not challenged Defendants' position that this prosecution history applies to all four of the patents here at issue.

As to Defendants' proposed construction, however, Defendants' proposal of "an association with a stream of data" is redundant and confusing when read in the context of surrounding claim language, such as reproduced above ("generating a packet watermark associated with the stream of data").  Also, although Plaintiffs have not challenged Defendants' position that the above-reproduced prosecution history applies to all four of the patents here at issue, Defendants do not persuasively show that the patentee used the word "modifies" so as to require changing an existing packet.  Instead, as Plaintiffs argued at the October 20, 2021 hearing, the patentee's use of "modifies" in the above-reproduced prosecution history can be fairly understood as encompassing the creation of a packet so as to be different than it would have otherwise been.

With that understanding, the Court hereby construes **"packet watermark"** to mean **"packet modification that enables robust identification of the contents or integrity of the packet and/or data stream."**

### 3. "packet watermark indicates the integrity of at least one of the plurality of packets"

| "packet watermark indicates the integrity of at least one of the plurality of packets" ('222 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | The packet watermark provides an indication that the packet was not altered or modified in transit for at least one of the plurality of packets. |

(Dkt. #30, Ex. A, at p. 1; Dkt. #41-1, at p. 1).

## A. The Parties' Positions

Plaintiffs argue that "the claim language is clear to one skilled in the art on its face," and "Defendants' proposed construction has zero support in the intrinsic record and should be rejected." (Dkt. #37, at p. 7).

Defendants respond that "Blue Spike has not offered any evidence that this term has an ordinary or usual meaning to a POSITA," and "the definition of 'integrity' that is proposed in Grande's construction is expressly incorporated into the '222 Patent." (Dkt. #39, at p. 6).

Plaintiffs reply that Defendants' proposed construction is derived from a different patent specification and for a different term ("verification"). (Dkt. #40, at p. 2).

## B. Analysis

Claim 1 of the '222 Patent, for example, recites (emphasis added):

1. A process for transmitting a stream of data, comprising:
   receiving a stream of data;
   organizing the stream of data into a plurality of packets;
   generating a packet watermark associated with the stream of data wherein the *packet watermark indicates the integrity of at least one of the plurality of packets*;

> combining the packet watermark with each of the plurality of packets to form watermarked packets; and
>
> transmitting at least one of the watermarked packets across a network.

Defendants rely on United States Patent Application No. 09/731,040 ("the '040 Application," attached to Defendants' responsive claim construction brief as Exhibit 10), which the '222 Patent "incorporate[s] by reference, in its entirety." '222 Patent at 1:44–46.  The '040 Application purportedly defines "integrity" in the following portion cited by Defendants:

> Verification:  Called "*integrity*," in cryptography, an intruder *preferably* cannot substitute false messages for legitimate ones; the receiver of the message (embedded or otherwise within the value-added information) *preferably* is assured that the message (or by effects, the origin of the carrier within which the message is stored) that the message was not modified or altered in transit.

(Dkt. #39, Ex. 10, '040 Application, at p. 16) (p. 21 of 102 of Ex. 10) (emphasis modified).

To whatever extent this disclosure is clear enough to be considered as a potential lexicography of any term, the usage of the word "preferably" establishes that the cited statements are *not* sufficiently clear and unmistakable so as to provide a definition for the term "integrity." *See Omega Eng'g*, 334 F.3d at 1324 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added).

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes **"packet watermark indicates the integrity of at least one of the plurality of packets"** to have its **plain meaning**.

### 4. "stream of data"

| "stream of data" ('222 Patent, Claim 1; '307 Patent, Claims 1, 6; '705 Patent, Claim 8) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | An undifferentiated, byte-by-byte flow of data. |

(Dkt. #30, Ex. A, at p. 1; Dkt. #41-1, at pp. 1–2).

### A. The Parties' Positions

Plaintiffs argue that "Defendants seek to limit the claims by cherry-picking selected extraneous evidence, with zero support in the intrinsic record," and "[n]owhere in the specification is 'stream of data' so limited, including those passages cited by Defendants." (Dkt. #37, at p. 8).

Defendants respond that "Blue Spike's allegations are nonsensical in that on the one hand the 'stream of data' is something that exists prior to being organized into a plurality of packets and on the other hand comprises the plurality of packets itself." (Dkt. #39, at p. 7). Defendants submit that "Grande proposes to define 'stream of data' using the definition of 'data stream' set forth in the contemporary 2002 edition of the Microsoft Dictionary, which is a definition that would be understood by a POSITA in light of the claims and specification." (*Id.*) (citation omitted).

Plaintiffs reply that "Grande's construction is nonsensical and unduly limiting in light of the intrinsic record," and "[a] POSITA would understand 'stream of data' as used in the claims." (Dkt. #40, at p. 3).

### B.  Analysis

Claim 1 of the '222 Patent, for example, recites (emphasis added):

1.  A process for transmitting a *stream of data*, comprising:
    receiving a *stream of data*;
    organizing the *stream of data* into a plurality of packets;
    generating a packet watermark associated with the *stream of data* wherein the packet watermark indicates the integrity of at least one of the plurality of packets;
    combining the packet watermark with each of the plurality of packets to form watermarked packets; and
    transmitting at least one of the watermarked packets across a network.

Defendants cite an extrinsic technical dictionary that defines "data stream" as: "An undifferentiated, byte-by-byte flow of data."  (Dkt. #39, Ex. 12, *Microsoft Computer Dictionary* 145 (5th ed. 2002).)

Plaintiffs cite the recital of "organizing the stream of data into a plurality of packets," arguing that this is broader than Defendants' proposed construction, but on its face the claim uses the term "stream of data" in a manner consistent with the definition cited by Defendants.  That is, the claim recites organizing a byte-by-byte flow of data into a plurality of packets.  Further, "stream of data" is used here in a technical sense and is not a phrase used in common parlance, so this is a particularly appropriate circumstance in which extrinsic technical evidence may be considered.  *See Phillips*, 415 F.3d at 1318 ("We have especially noted the help that technical dictionaries may provide to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms.") (quoting *Vitronics*, 90 F.3d at 1584 n.6).

Claim 8 of the '705 Patent, however, recites in relevant part (emphasis added):

8.  An electronic method for selling at least one item and/or service said method comprising:
    establishing a communication link between a vending system and a purchasing system; and

> transmitting a *stream of data comprising a plurality of user packets* using
> a packet watermark protocol, said transmitting comprising: . . . .

Because this claim recites a stream of data "comprising a plurality of user packets," this claim

demonstrates that the patentee used the term "stream of data" in a manner that is broader than the

above-cited technical dictionary definition submitted by Defendants.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no

further construction is necessary. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and

should not be) required to construe every limitation present in a patent's asserted claims."); *see*

*also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"stream of data"** to have its **plain meaning**.

### 5. "packet(s)"

| **"packet(s)"** ('222 Patent, Claim 1; '307 Patent, Claims 1, 6; '705 Patent, Claim 8) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | A transmission unit of a fixed maximum size that consists of binary digits representing both data and a header containing addresses, routes, and other identifying information about the packet. |

(Dkt. #30, Ex. A, at p. 1; Dkt. #41-1, at p. 4).

### A. The Parties' Positions

Plaintiffs argue that "Defendants' proposal has zero support in the intrinsic record and

should be rejected." (Dkt. #37, at p. 10).

Defendants respond that Plaintiffs rely on extrinsic evidence that was not timely

disclosed, and "[e]ven if Blue Spike could rely on this extrinsic evidence, however, this

reference is inconsistent with the intrinsic evidence." (Dkt. #39, at p. 8). Defendants argue that "a POSITA would have understood a packet and a chunk of data to have different meanings and Blue Spike's attempts to broaden the scope of the term 'packets' beyond the intrinsic evidence should be rejected." (*Id.*).

Plaintiffs reply that "Blue Spike merely stated that Grande's extrinsic evidence is not the sole authority on a definition of 'packet(s),'" and "Blue Spike makes no assertion that terms like 'chunk' of the Shuler reference correspond to such terms in the '222 patent specification." (Dkt. #40, at p. 3).

At the October 20, 2021 hearing, the Court proposed construing this disputed term to mean "a unit of information transmitted as a whole from one device to another device on a network." Plaintiffs had no objection. Defendants maintained their arguments.

### B. Analysis

Claim 1 of the '222 Patent, for example, recites (emphasis added):

1. A process for transmitting a stream of data, comprising:
     receiving a stream of data;
     organizing the stream of data into a plurality of *packets*;
     generating a *packet* watermark associated with the stream of data wherein the *packet* watermark indicates the integrity of at least one of the plurality of *packets*;
     combining the *packet* watermark with each of the plurality of *packets* to form watermarked *packets*; and
     transmitting at least one of the watermarked *packets* across a network.

The claim language provides no insight into the meaning of "packets," other than that the term is used in the context of data communications. Because this term is being used in a technical sense rather than according to common parlance, this is a particularly appropriate circumstance in which extrinsic technical evidence may be considered. *See Phillips*, 415 F.3d at 1318 (citing *Vitronics*, 90 F.3d at 1584 n.6).

Defendants cite an extrinsic technical dictionary that defines the term "packet" as follows:

> packet *n.* 1. A unit of information transmitted as a whole from one device to another on a network. 2. In packet-switching networks, a transmission unit of fixed maximum size that consists of binary digits representing both data and a header containing an identification number, source and destination addresses, and sometimes error-control data. *See also* packet switching.

(Dkt. #39, Ex. 12, *Microsoft Computer Dictionary* 385 (5th ed. 2002)).

The extrinsic evidence cited by Plaintiffs ("Rus Shuler, 'How Does the Internet Work?,' Pomeroy IT Solutions (2002), available at https://web.stanford.edu/class/msande91si/www-spr04/readings/week1/InternetWhitepaper.htm") (Dkt. #37, at pp. 9–10) is consistent with the above-reproduced technical definition cited by Defendants.   Nonetheless, Defendants do not sufficiently justify limiting the term "packets" to the more detailed above-reproduced definition "2" as opposed to above-reproduced definition "1."

The Court therefore hereby construes **"packet(s)"** to mean **"a unit of information transmitted as a whole from one device to another device on a network."**

### 6.   "combining (using a processor), the packet watermark with each of the plurality of packets to form watermarked packets"

| "combining (using a processor), the packet watermark with each of the plurality of packets to form watermarked packets" ('222 Patent, Claim 1; '307 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | Including the same packet watermark in the header of every one of the plurality of the packets. |

(Dkt. #30, Ex. A, at p. 2; Dkt. #41-1, at p. 6).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants' proposal is an effort to read into the claims an example from the specification."  (Dkt. #37, at p. 11).

Defendants respond that "the specification makes clear that the invention relies upon including the same watermark in the header of the packets."  (Dkt. #39, at p. 9).

Plaintiffs reply that "Grande's citations describe '[s]ample [e]mbodiment[s]' or 'particular case[s],' which are merely exemplary and not controlling."  (Dkt. #40, at pp. 3–4) (citation omitted).  Plaintiffs also argue claim differentiation as to Claims 8 and 16 of the '222 Patent.  (*Id.*, at p. 4).

### B.  Analysis

Claim 1 of the '222 Patent, for example, recites (emphasis added):

> 1.  A process for transmitting a stream of data, comprising:
>      receiving a stream of data;
>      organizing the stream of data into a plurality of packets;
>      generating a packet watermark associated with the stream of data wherein the packet watermark indicates the integrity of at least one of the plurality of packets;
>      *combining* the packet watermark with *each* of the plurality of packets to form watermarked packets; and
>      transmitting at least one of the watermarked packets across a network.

On its face, this claim language recites combining "the packet watermark" with "each" of the plurality of packets to form watermarked packets.  This recital of "the packet watermark" refers back to "a packet watermark" generated in the "generating . . ." step.  This is a particular packet watermark, not merely any packet watermark.  Further, the recital of combining with "each" packet is fairly read as referring to every one of the plurality of packets.  Defendants' proposed construction is consistent with this express claim language and will assist the finder of fact.  Also, the specification is consistent with this understanding.  *See* '222 Patent at 4:67–5:2 &

11:19–23 ("Preferably, the same 32-bit watermark may be placed in each and every packet in the flow.").

Plaintiffs argue claim differentiation as to Claims 8 and 16 of the '705 Patent, which recite (emphasis added):

> 8.  An electronic method for selling at least one item and/or service said method comprising:
>
>> . . .
>
>> transmitting a stream of data comprising a plurality of packets using a packet watermark protocol, said transmitting comprising:
>>
>>> generating a packet watermark associated with the stream of data wherein the packet watermark enables identification of at least one of the plurality of packets; and
>>>
>>> *combining the packet watermark with each of the plurality of packets to form watermarked packets*;
>>
>> . . . .
>
> * * *
>
> 16.  The electronic method of claim 8, wherein communications occurring on the communication link utilize receiving a stream of data;
>
>> organizing the stream of data into a plurality of packets;
>>
>> generating a packet watermark associated with the stream of data wherein the packet watermark enables identification of at least one of the plurality of packets;
>>
>> combining the packet watermark with each of the plurality of packets to form watermarked packets; and
>>
>> transmitting at least one of the watermarked packets across a network;
>>
>> wherein the step of generating a packet watermark comprises:
>>
>> generating a watermark packet key;
>>
>> associating a unique identifier with the watermark packet key;
>>
>> assigning a quality of service level to the stream of data; and
>>
>> generating a packet watermark comprising: the unique identifier associated with the watermark packet key; and the quality of service level assigned to the stream of data;
>>
>>> *wherein the step of combining the packet watermark comprises: placing the packet watermark in a header for each of the plurality of packets to form watermarked packets*.

Claim 16 recites multiple additional limitations, including "placing the packet watermark *in a header* for each of the plurality of packets," so the doctrine of claim differentiation is of

limited weight.  *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, *and that limitation is the only meaningful difference between the two claims*.") (emphasis added).

Nonetheless, the absence of any recital of a "header" in the independent claims here at issue, as well as the absence of any compelling persuasive evidence from Defendants to support introducing a "header" limitation, warrant rejecting Defendants' proposal of requiring the watermark to be "in the header" of each packet.

At the October 20, 2021 hearing, the Court proposed construing this disputed term to mean "including the same packet watermark in every one of the plurality of packets." Defendants agreed with the Court's proposed construction.  Plaintiffs' counsel expressed agreement but also expressed a desire to confer with co-counsel after the conclusion of the hearing.  In a written submission after the hearing, Plaintiffs presented no objection.  (*See* Dkt. #49.)  Thus, in addition to the discussion set forth above, the parties appear to agree with the Court's conclusion.

The Court therefore hereby construes **"combining (using a processor), the packet watermark with each of the plurality of packets to form watermarked packets"** to mean **"including the same packet watermark in every one of the plurality of packets."**

### 7. "packet flow"

| "packet flow" ('307 Patent, Claims 1, 6) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | A collection of packets designated to be transmitted along a particular network path. |

(Dkt. #30, Ex. A, at p. 3; Dkt. #41-1, at p. 15).

### A. The Parties' Positions

Plaintiffs argue that "[n]o uses of 'flow' or 'packet flow' in the intrinsic record match Defendants' proposed construction, and Defendants' proposal should be rejected."  (Dkt. #37, at p. 12).

Defendants respond that "[t]he specification of the '222 Patent provides a definition of the term 'flow,'" and "[w]here an explicit definition is provided by the applicant for a term, that definition will control interpretation of the term as it is used in the claim."  (Dkt. #39, at p. 10) (citation omitted).

Plaintiffs reply: "Blue Spike disagrees that 'packet flow' was expressly defined.  As asserted in Blue Spike's Opening Brief, Grande ignores other examples in the specification.  No uses of 'flow' or 'packet flow' in the intrinsic record match Grande's proposed construction, and Grande's proposal should be rejected."  (Dkt. #40, at p. 4) (citing Dkt. #37, at pp. 11–12).

At the October 20, 2021 hearing, the Court proposed construing this disputed term to mean "packets moving along a particular path in a data network."  The parties addressed aspects of this proposal but neither side expressed agreement with the proposal as a whole.  For example, Plaintiffs expressed concern that the word "particular" might connote a "pre-ordained" path.

### B.  Analysis

The specification discloses:

> The present invention adds the novel layer of identity of the packets and subsequent provisioning by means of authenticating packets along a particular path ("flow") and perhaps using the best path as history about various paths are captured by a database used for such purposes.

'307 Patent at 8:53–57.

This disclosure regarding "flow," which is set off by quotation marks within the disclosure, amounts to a definition of "flow" in the context of data packets as referring to packets moving along a particular path in a data network.  *See Sinorgchem*, 511 F.3d at 1136 ("[t]he term . . . is set off by quotation marks—often a strong indication that what follows is a definition").  Referring to a "particular" path ('307 Patent at 8:53–57 (quoted above)) is appropriate because all of the packets in a "flow" are moved along the same path in the data network.  This does not require the "particular path" to be determined in advance of the packets beginning to flow.  (*See id.*)

The Court accordingly hereby construes **"packet flow"** to mean **"packets moving along a particular path in a data network."**

### 8.  "provisioning"

| **"provisioning"**<br>('307 Patent, Claim 1) ||
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite. |

(Dkt. #30, Ex. A, at p. 3; Dkt. #41-1, at p. 15).

### A.  The Parties' Positions

Plaintiffs argue that "[t]he term 'provisioning' speaks for itself against Defendants' assertion [of indefiniteness]," and "Defendants cite various places in the specification where the term 'provisioning' is used, thereby admitting that the term is used and described with respect to described embodiments."  (Dkt. #37, at p. 13).

Defendants respond that "the term 'provisioning' creates a vast zone of uncertainty for those skilled in the art as to what constitutes infringement," and "the specification provides numerous confusing and inconsistent uses of the term 'provisioning,' as a seemingly generic 'catchall' term . . . ."  (Dkt. #39, at p. 10).  Defendants also argue that "[t]he surrounding context of the claims also provides no insight as to the meaning of the term 'provisioning.'"  (*Id.*, at p. 11).

Plaintiffs' reply that "[t]he word 'provisioning' speaks for itself regardless of Grande's 'confusion.'"  (Dkt. #40, at p. 4).

### B.  Analysis

Defendants cite the use of "provisioning" in both the preamble and the body of Claim 1 of the '307 Patent, which recites (emphasis added):

1.  A process for *provisioning* a stream of data, comprising:
    receiving a stream of data;
    organizing the stream of data into a packet flow comprising a plurality of packets;
    generating, using a processor, a packet watermark associated with the packet flow wherein the packet watermark enables discrimination between packet flows;
    combining, using a processor, the packet watermark with each of the plurality of packets to form watermarked packets; and
    *provisioning* at least one of the watermarked packets across a network.

Defendants have not argued that the preamble is limiting, and in any event, Defendants do not demonstrate that this recital of "provisioning" in the preamble is necessarily inconsistent

with, or confusing in light of, the separate use of the term "provisioning" in the body of the claim.

Defendants also cite the following disclosures as examples of purportedly "confusing and inconsistent uses of the term 'provisioning'" (Dkt. #39, at p. 10):

(a) "A need exists for *optimizing and provisioning the allocation of bandwidth*." '222 patent 2:43–44 (emphasis added).

(b) "Using the present invention, *data can now be sent to a receiver in a manner which provisions bandwidth* in an efficient manner (the novel embodiments described herein)." *Id.* at 7:36–39 (emphasis added).

(c) "An advantage of the present invention is that it can create 'postage for packets' (more articulately described as '*bandwidth provisioning*').["] *Id.* at 7:40–42 (emphasis added).

(d) "This document addresses three things to assist in getting this done: efficient *provisioning of the packets* on the network [sic] the creation of a so-called 'packet watermark'; creation of bandwidth credentials 'to enhance liquidity and *derivative pricing provisioning* for future estimated use of bandwidth...'" *Id.* at 8:29–34 (emphasis added).

(e) "The present invention adds the novel layer of identity of the packets and *subsequent provisioning by means of authenticating packets along a particular path* ('flow') and perhaps using the best path as history about various paths are captured by a database used for such purposes. *Id.* at 8:52–57 (emphasis added).

(f) "[T]he present invention introduces a number of improvements to *the handling of data (e.g., provisioning)* and by extension the bandwidth used to represent said data." *Id.* at 14:5–8 (emphasis added).

(g) "Features of the present invention *provision for additional data and time overhead* to handle congestion with market-based features." *Id.* at 16:61–63 (emphasis added).

(Dkt. #39, at p. 11) (footnote omitted).

Rather than demonstrating indefiniteness, however, these various disclosures cited by Defendants merely demonstrate that "provisioning" is a broad term, and "[b]readth is not

indefiniteness." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1583 (Fed. Cir. 1996) (quoting *In re Gardner*, 427 F.2d 786, 788 (C.C.P.A. 1970)).

The Court therefore hereby expressly rejects Defendants' indefiniteness argument, and Defendants present no alternative proposed construction. The Court therefore hereby construes **"provisioning"** to have its **plain meaning**.

### 9. "organizing the stream of data into a packet flow comprising a plurality of packets"

| "organizing the stream of data into a packet flow comprising a plurality of packets" ('307 Patent, Claim 1) ||
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | Converting an undifferentiated, byte-by-byte flow of data into multiple packets and further into a group of packets which are collectively designated for transmission along a particular network path. |

(Dkt. #30, Ex. A, at p. 3; Dkt. #41-1, at p. 16).

### A. The Parties' Positions

Plaintiffs argue that "Defendants again seek to limit the claims with reference to selected extraneous evidence, with zero support in the intrinsic record," and "the word 'converting' appears nowhere in the specification." (Dkt. #37, at p. 14).

Defendants respond that "Grande's proposed construction of the phrase 'organizing the stream of data into a packet flow comprising a plurality of packets)' is a combination of the proposed constructions for 'stream of data,' 'packet flow' and 'packets.'" (Dkt. #39, at p. 12). As to Defendants' proposal of "converting," Defendants argue that "[g]iven the constructions of 'stream of data,' 'packet flow' and 'packets,' mere 'organizing' (*i.e.*, rearranging) of the stream of data would be nonsensical, because packets are not defined in the specification as just a

reorganized stream of data, nor would such definition be consistent with the Microsoft Dictionary." (*Id.*)

Plaintiffs reply: "The Microsoft Dictionary does not include a definition for the phrase at issue, and Grande's position assumes the Court will adopt the rest of Grande's constructions, which it should not.  Finally, for purposes of this claim term, the word 'converted' does not appear in the intrinsic record and should not be used to limit any construction of the term at issue." (Dkt. #40, at p. 5).

## B. Analysis

Claim 1 of the '307 Patent recites (emphasis added):

1. A process for provisioning a stream of data, comprising:
   receiving a stream of data;
   *organizing the stream of data into a packet flow comprising a plurality of packets*;
   generating, using a processor, a packet watermark associated with the packet flow wherein the packet watermark enables discrimination between packet flows;
   combining, using a processor, the packet watermark with each of the plurality of packets to form watermarked packets; and
   provisioning at least one of the watermarked packets across a network.

The constituent terms "stream of data," "packet flow," and "packets" are addressed separately above.  The remaining dispute is whether "organizing . . ." requires "converting," as Defendants propose.  Defendants argue that merely reorganizing is insufficient (Dkt. #39, at p. 12), but Defendants do not adequately justify introducing a requirement of "converting."  As to the remainder of Defendants' proposal, the Court separately addresses construction of the constituent term "packet flow," above.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and

should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"organizing the stream of data into a packet flow comprising a plurality of packets"** to have its **plain meaning** (apart from the Court's constructions of constituent terms).

### 10. "associated with the packet flow"

| **"associated with the packet flow"**<br>('307 Patent, Claim 1) ||
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Generated based on an analysis of the entire stream of data. |

(Dkt. #30, Ex. A, at p. 3; Dkt. #41-1, at p. 17).

### A. The Parties' Positions

Plaintiffs argue that "[t]he word 'associated' is clear on its face," and "Defendants' assertion is contradictory to its proposed construction of the term 'packet flow,' above, in that Defendants are now asserting that 'packet flow' means 'entire stream of data.'"  (Dkt. #37, at pp. 14–15).

Defendants respond that Plaintiffs rely upon extrinsic evidence that was not timely disclosed and, moreover, Defendants argue that "the general definition of 'associated' [cited by Plaintiffs does not] provide any insight into how a 'packet watermark' is 'associated with the packet flow,' since the claim also requires that the packet watermark be able to enable discrimination between packet flows."  (Dkt. #39, at p. 13).  Defendants further argue that "because the stream of data has been organized into the plurality of packets, the association of

the packet watermark to the packet flow must be generated based on an analysis of the entire stream of data—the stream of data that forms the packet flow." (*Id.*)

Plaintiffs reply that "Blue Spike merely supplied one example of a definition of 'associated,' as used in common parlance," and "the claim language does not require a specific 'how'; it merely requires that the packet watermark is 'associated with the packet flow.'" (Dkt. #40, at p. 5).

At the October 20, 2021 hearing, Defendants argued that to achieve the objectives of the purported invention, the watermark must apply to the entire thing being transmitted, which is the entire stream of data.   Plaintiffs argued that even if the entire stream must be used when generating or organizing, the term "associated" does not require using the entire stream.

### B. Analysis

Claim 1 of the '307 Patent recites (emphasis added):

1. A process for provisioning a stream of data, comprising:
      receiving a stream of data;
      organizing the stream of data into a packet flow comprising a plurality of packets;
      generating, using a processor, a packet watermark *associated with the packet flow* wherein the packet watermark enables discrimination between packet flows;
      combining, using a processor, the packet watermark with each of the plurality of packets to form watermarked packets; and
      provisioning at least one of the watermarked packets across a network.

Defendants argue that "because the stream of data has been organized into the plurality of packets, the association of the packet watermark to the packet flow must be generated based on an analysis of the entire stream of data—the stream of data that forms the packet flow."  (Dkt. #39, at p. 13).  Defendants do not persuasively demonstrate that this must be so.  This is not evident on the face of the claim, and Defendants identify no support in the specification.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"associated with the packet flow"** to have its **plain meaning**.

### 11.  "watermark packet key"

| **"watermark packet key"** (’307 Patent, Claim 6) ||
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | A 4096 bit random sequence. |

(Dkt. #30, Ex. A, at p. 3; Dkt. #41-1, at p. 17).

### A.  The Parties' Positions

Plaintiffs argue that "the claim language is clear to one skilled in the art on its face," and "Defendants' proposal is another effort to read into the claims an example from the specification." (Dkt. #37, at pp. 15 & 16).

Defendants respond that "[t]he ’307 Patent provides a definition of the term 'Watermark Packet Key,'" and the "[p]atentee acted as their own lexicographer, defin[ing] the term 'Watermark Packet Key' as being a 4096 bit random sequence." (Dkt. #39, at p. 14).  Defendants argue that "[w]here there is only a single embodiment disclosed, as here, it is proper to construe the limitation to include the only relevant disclosure." (*Id.*).

Plaintiffs reply that "Grande's citations describe a 'Sample Embodiment' with an example 'case,' which is merely exemplary and not controlling." (Dkt. #40, at pp. 5–6) (citation omitted).

### B.  Analysis

Claim 6 of the '307 Patent recites (formatting modified; emphasis added):

> 6.  The process of claim 1, wherein the step of generating a packet watermark comprises:
> generating a *watermark packet key*;
> associating a unique identifier with the *watermark packet key*; and
> generating a packet watermark comprising the unique identifier associated with the *watermark packet key*.

Defendants cite the following disclosure:

> *For example*, the sender may create an array of SHA-1 hashes (or any hashing protocol deemed secure by the party or parties mutually) of the flow using a 4096 bit random sequence (the 4096 bit random sequence is referred to as the "Watermark Packet Key"). More particularly, the input to a hash function is comprised of three things: the Watermark Packet Key (*in this case*, 4096 bits), the Watermark (in this case, 32 bits), and a portion of the flow (for example, that portion of the flow that will be placed in a given packet).

'307 Patent at 11:40–48 (emphasis added); *see id.* at 12:20–33.

The phrases "[f]or example" and "in this case" demonstrate that the patentee disclosed the "4096 bit random sequence" as an example, not a definition. *See id.* Defendants thus do not show that the patentee "*clearly set forth* a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (emphasis added).

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"watermark packet key"** to have its **plain meaning**.

**12.  "unique identifier"**

| **"unique identifier"** (''307 Patent, Claim 6) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | A one-of-a-kind 28 bit data string. |

(Dkt. #30, Ex. A, at p. 3; Dkt. #41-1, at p. 18).

### A.  The Parties' Positions

Plaintiffs argue that "the claim language is clear to one skilled in the art on its face," and "Defendants' proposal is another effort to read into the claims an example from the specification."  (Dkt. #37, at pp. 16 & 17).

Defendants respond that "[t]he '307 Patent provides a definition of the term 'unique identifier,'" and the "[p]atentee acted as his own lexicographer, defining the term 'unique identifier' as being a 28-bit data string, with 'unique' one-of-a-kind meaning."  (Dkt. #39, at p. 15).  Defendants argue that "where there is only a single embodiment disclosed, as here, it is proper to construe the limitation to include the only relevant disclosure."  (*Id.*) (citation omitted).

Plaintiffs reply that "Grande's citations describe a 'Sample Embodiment' with an example case, which is merely exemplary and not controlling."  (Dkt. #40, at p. 6).

### B.  Analysis

Claim 6 of the '307 Patent recites (formatting modified; emphasis added):

6.  The process of claim 1, wherein the step of generating a packet watermark comprises:
    generating a watermark packet key;

> associating a *unique identifier* with the watermark packet key; and
> generating a packet watermark comprising the *unique identifier* associated with the watermark packet key.

Defendants cite the following disclosure:

> The 32-bit watermark, or a portion thereof, may act as an identifier.  No particular format is required for the watermark, and accordingly almost any format may be used.  In the example illustrated, the 4MSBs [(four most significant bits)] are used for the QoS level, and the remaining 28 bits can be used to store a unique identifier.  One possible use for the remaining 28 bits is to store a unique identifier that is associated with a watermark packet key—which key can be used to help authenticate the data flows.

'307 Patent at 11:31–39.

The word "example" and the phrases "can be used" and "[o]ne possible use" demonstrate that the patentee disclosed using 28 bits as an example, not a definition.  *See id.*  Defendants thus do not show that the patentee "*clearly set forth* a definition of the disputed claim term in either the specification or prosecution history."  *CCS Fitness*, 288 F.3d at 1366 (emphasis added).

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"unique identifier"** to have its **plain meaning**.

### 13.  "wherein said packet content is less than all data of a data object"

| **"wherein said packet content is less than all data of a data object"** <br> ('746 Patent, Claim 9) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite |

(Dkt. #30, Ex. A, at p. 4; Dkt. #41-1, at p. 19).

### A.  The Parties' Positions

Plaintiffs argue that this term "conveys to the reader of claim 9 that the packet content of claim 9 is less than all data of a data object," and "[s]uch a concept is used throughout the specification."  (Dkt. #37, at p. 18) (citing '746 Patent at 3:36–37).

Defendants respond that "[d]ue to the indefiniteness of the term 'data object' the phrase 'wherein said packet content is less than all data of a data object' is also indefinite."  (Dkt. #39, at p. 16).  Further, Defendants argue: "[B]ased upon the numerous inconsistent meanings of 'data object' within the specification, the term 'wherein said packet content is less than all data of a data object' is also indefinite.  For example, in the case where 'data object' means 'a discrete analog waveform,' is in 'a physical format,' or is a thing represented by 'independently derived values' that can be defined by a 'simple linear equation,' it is unclear to a POSITA how such 'data objects' have data, or what data would even constitute 'all data' of such a thing."  (*Id.*).

Plaintiffs reply that "[o]ne example of a data object is plainly stated in the specification: 'for example, copyrighted music files' (['746 Patent at] 3:35)."  (Dkt. #40, at p. 6).  Plaintiffs further reply: "As to other ways in which data is described in the specification that Grande finds 'confusing,' the specification is clear on its face that these are ways in which data may be represented or stored digitally, a necessity when manipulating and storing data on a computer."  (*Id.*, at p. 7).

### B.  Analysis

Claim 9 of the '746 Patent recites (emphasis added):

9.  A method for generating a watermarked packet, comprising:
     a processor applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification);
          *wherein said packet content is less than all data of a data object*;
     a processor generating a watermarked packet comprising said packet watermark and at least some of said packet content.

In the example cited by Plaintiffs, the specification refers to "copyrighted music files" as an example of data that may be exchanged over a network or that may be contained in physical objects (presumably referring to compact discs).  *See* '746 Patent at 3:29–35.  This provides context for understanding the phrase "less than all data of a data object."  The parties' arguments regarding the constituent term "data object" are discussed separately, below.  On balance, Defendants do not show that the phrase "all data" gives rise to any lack of reasonable certainty.  *See Nautilus*, 134 S. Ct. at 2129; *see also Sonix*, 844 F.3d at 1377.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument, and Defendants present no alternative proposed construction.  The Court accordingly hereby construes **"wherein said packet content is less than all data of a data object"** to have its **plain meaning**.

### 14.  "data object"

| "data object" ('746 Patent, Claim 9) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite |

(Dkt. #30, Ex. A, at p. 4; Dkt. #41-1, at p. 19).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants cite various places in the specification where the term 'data object' is used, thereby admitting that the term is used and described with respect to described embodiments," and "[s]uch a concept is used throughout the specification."  (Dkt. #37, at p. 18) (citing '746 Patent at 3:36–37).

Defendants respond that "the term 'data object' creates a vast zone of uncertainty for those skilled in the art." (Dkt. #39, at p. 17). For example, Defendants submit that "while in one instance the specification describes 'data objects' as things such as the discrete analog waveform or data signals, in other portions of the specification it is indicated that 'data objects' can be offered in 'physical formats.'" (Dkt. #39, at p. 17) (citation omitted).

Plaintiffs reply by citing their arguments as to the term "wherein said packet content is less than all data of a data object," which is discussed above. (*See* Dkt. #40, at pp. 6–7).

### B. Analysis

Claim 9 of the '746 Patent recites (emphasis added):

9. A method for generating a watermarked packet, comprising:
   a processor applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification);
   wherein said packet content is less than all data of a *data object*;
   a processor generating a watermarked packet comprising said packet watermark and at least some of said packet content.

Defendants cite disclosure that "the terms 'data object', 'data', 'discrete analog waveform', or 'data signal' may be used interchangeably" ('746 Patent 2:56–58), as well as disclosure of "sales of a variety of data objects offered in physical formats." '746 Patent at 3:24–28. The various disclosures cited by Defendants merely demonstrate that "data object" is a broad term, and "[b]readth is not indefiniteness." *Athletic Alternatives*, 73 F.3d at 1583 (quoting *In re Gardner*, 427 F.2d at 788). Disclosure regarding characterizing data objects does not compel otherwise. *See* '746 Patent 3:60–67 ("coarser estimates of the data objects' aesthetics or characteristics enable mathematical values to be assigned to a larger portion or subset of the data object itself"); *see id.* at 3:65–4:2 ("[a] simple linear equation can be used to define the independently derived values representing the data object").

The Court therefore hereby expressly rejects Defendants' indefiniteness argument, and Defendants present no alternative proposed construction.  The Court accordingly hereby construes **"data object"** to have its **plain meaning**.

### 15.  "WID (Watermark Identification)"

| "WID (Watermark Identification)" ('746 Patent, Claim 9) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Combination of the hash output, the watermark packet key, and the 32-bit watermark. |

(Dkt. #30, Ex. A, at p. 4; Dkt. #41-1, at p. 20).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants' proposal is another effort to read into the claims an example from the specification."  (Dkt. #37, at p. 19).

Defendants respond that "[t]he specification of the '307 Patent provides a definition of the term 'Watermark Packet Key' . . . ."  (Dkt. #39, at p. 18).

Plaintiffs reply that "Grande's citations describe a 'Sample Embodiment' with an example 'case,' which is merely exemplary and not controlling."  (Dkt. #40, at p. 7) (citation omitted).

At the October 20, 2021 hearing, Defendants emphasized that "WID" is not a known term of art, and Defendants submitted that their proposed construction is based on the only example disclosed in the specification.  Plaintiffs submitted an alternative proposed construction: "unique identifier associated with a watermark."  Plaintiffs argued that a WID allows devices to identify a watermark and distinguish it from other watermarks. *See* '746 Patent at 11:55–58.

### B.  Analysis

Claim 9 of the '746 Patent recites (emphasis added):

9.  A method for generating a watermarked packet, comprising:
    a processor applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a *WID (Watermark Identification)*;
    wherein said packet content is less than all data of a data object;
    a processor generating a watermarked packet comprising said packet watermark and at least some of said packet content.

Defendants cite the following disclosure that "[t]he outputs of the hash, the Watermark Packet Key, and the 32-bit watermark are combined to create the Watermark Identification ('WID')." '746 Patent at 11:51–54.

This disclosure, however, appears within a section titled "Sample Embodiment," and the cited paragraph begins with the phrase "[f]or example." *Id.* at 11:5 & 11:33. Thus, the disclosure relied upon by Defendants relates to an example, not a definition. *See id.* Defendants do not show that the patentee "*clearly set forth* a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness*, 288 F.3d at 1366 (emphasis added).

Nonetheless, "some construction of the disputed claim language will assist the jury to understand the claims." *TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471-WCB, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J., sitting by designation). The Court therefore adopts the above-noted alternative proposed construction presented by Plaintiffs at the October 20, 2021 hearing. *See also* '746 Patent at 11:55–58 (cited by Plaintiffs at the hearing).

The Court accordingly hereby construes **"WID (Watermark Identification)"** to mean **"unique identifier associated with a watermark."**

### 16. "agreed upon purchase value"

| "agreed upon purchase value" ('705 Patent, Claim 8) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | An amount of bandwidth usage that is calculated from a fair market value of the cost of goods being purchased plus a cost of bandwidth used to complete the transaction. |

(Dkt. #30, Ex. A, at p. 4; Dkt. #41-1, at pp. 20–21).

### A. The Parties' Positions

Plaintiffs argue that "Defendants again seek to limit the claims based on exemplary embodiments from the specification." (Dkt. #37, at p. 21).

Defendants respond that "the claim itself requires that the debit to the purchaser's account is in an amount of bandwidth usage that corresponds to the agreed upon purchase value." (Dkt. #39, at p. 18). Defendants also cite disclosure that Defendants argue demonstrates that "bandwidth usage that [*sic*] is calculated from a fair market value of the cost of goods being purchased plus a cost of bandwidth used to complete the transaction." (*Id.*, at p. 19). Further, Defendants argue that "it is clear from the prosecution history that the amount debited (*i.e.*, subtracted) from the purchaser's account was understood to be in 'bandwidth' and not other forms of currency as alleged by Plaintiff." (*Id.*, at pp. 19–20).

Plaintiffs reply that "Grande's citations describe a 'Sample Embodiment' with an example use case, which is merely exemplary and not controlling." (Dkt. #40, at p. 8) (citation omitted). Plaintiffs also submit that "'value' is described in various ways throughout the specification, including in terms of dollars." (*Id.*) (citing '705 Patent at 15:4–9 & 22:29–34).

Further, Plaintiffs argue that the prosecution history cited by Defendants does not warrant a narrow interpretation of the disputed term because the patent examiner's statements interpreted the prior art, not the claim language, and in any event "Applicant had no burden to rebut the examiner's statement to keep the claim breadth intact." (*Id.*)

### B. Analysis

Claim 8 of the '705 Patent recites (emphasis added):

8.  An electronic method for selling at least one item and/or service said method comprising:
    establishing a communication link between a vending system and a purchasing system; and
    transmitting a stream of data comprising a plurality of packets using a packet watermark protocol, said transmitting comprising:
        generating a packet watermark associated with the stream of data wherein the packet watermark enables identification of at least one of the plurality of packets; and
        combining the packet watermark with each of the plurality of packets to form watermarked packets;
        wherein the transmitting is for at least one of the following:
            receiving a request to purchase a selected item;
            determining a purchase value for the selected item;
            causing a debit to the purchaser's account in an amount of bandwidth usage which corresponds to the *agreed upon purchase value* for the selected item; and
            sending an instruction to deliver the selected item.

Defendants cite disclosure in the specification that:

> *In this embodiment* we use bandwidth to purchase other information resources such as kilowatts of power from a utility power grid. As such, *bandwidth acts as a currency* which has a defined (though perhaps fluctuating) *value*. The amount of bandwidth that is used to "*purchase*" a specified amount of power will be determined based on the market forces at play. The total amount of bandwidth will be the cost of the goods being purchased (in this case, the specified amount of power) plus the cost of the bandwidth used to complete the transaction—which may vary with the communication channel being used (e.g., the use of a PDA vs. the use of a cell phone). In effect, "bandwidth" is removed from my account in an amount necessary to complete the transaction.

'705 Patent at 22:46–58 (emphasis added).

This disclosure refers to a particular "embodiment," and specific features of disclosed embodiments should not be imported into the claims.  *See Phillips*, 415 F.3d at 1323.

Defendants also cite statements by the patent examiner during prosecution of the '705 Patent:

> One of ordinary skill in the art at time the invention was made would have recognized that applying the known techniques of Hansen would permit a mobile user to use mobile phone air time minutes (bandwidth) as currency to settle a debt and would have yielded predictable results as exhibited by the example taught by Hansen and resulted in an improved system.  It would have been recognized that applying the techniques of Hansen to the teachings of Racov would permit the Racov customer (i.e. the buyer) to *cause a debit to the account in an amount of bandwidth usage which corresponds to the agreed upon purchase value for the selected item*.

(Dkt. #39, Ex. 11, June 10, 2011 Office Action, at p. 7) (p. 37 of 43 of Ex. 11) (emphasis in original).

In this prosecution history, however, the examiner's statements merely show that the examiner understood the phrase "agreed upon purchase value" as having the meaning that the phrase has in ordinary parlance.  Indeed, the examiner did not refer to the "agreed upon purchase value" as being an amount of bandwidth, instead referring to "an amount of bandwidth usage which *corresponds* to the agreed upon purchase value."  (*Id.*) (emphasis modified).

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"agreed upon purchase value"** to have its **plain meaning**.

### 17. "the purchaser's account"

| "the purchaser's account" ('705 Patent, Claim 8) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendant's Proposed Construction** |
| No construction necessary | An account capable of holding an amount of bandwidth to be used to purchase an item or service. |

(Dkt. #30, Ex. A, at p. 4; Dkt. #41-1, at p. 22).

### A. The Parties' Positions

Plaintiffs argue that "Defendants again seek to limit the claims based on exemplary embodiments from the specification." (Dkt. #37, at p. 22).

Defendants respond that "the claim itself requires that the debit to the purchaser's account *be in an amount of bandwidth usage* that corresponds to the agreed upon purchase value." (Dkt. #39, at p. 20). Defendants urge that "[i]f the purchaser's account were not capable of holding an amount of bandwidth to be used to purchase an item, the claim is nonsensical in that it would require a debit to a purchaser's account in a currency (here, bandwidth usage) that is not supported by the account." (*Id.*).

Plaintiffs reply that "Grande ignores at least that 'account' is described in various ways throughout the specification, including in terms of being associated with dollars and/or rights . . . ." (Dkt. #40, at pp. 8–9).

At the October 20, 2021 hearing, Plaintiff cited disclosure in the specification regarding "transferring money." '705 Patent at 20:60–65.

### B. Analysis

Claim 8 of the '705 Patent recites, in relevant part (emphasis added):

8.  An electronic method for selling at least one item and/or service said method comprising:

 establishing a communication link between a vending system and a purchasing system; and

 transmitting a stream of data comprising a plurality of packets using a packet watermark protocol, . . .

  wherein the transmitting is for at least one of the following:

   receiving a request to purchase a selected item;

   determining a purchase value for the selected item;

   causing *a debit to the purchaser's account in an amount of bandwidth usage* which corresponds to the agreed upon purchase value for the selected item; and

   sending an instruction to deliver the selected item.

At first blush, the usage of "corresponds" appears to undercut Defendants' argument that the recited "debit" must be an amount of bandwidth (because the "debit" "corresponds to the agreed upon purchase value").

A fair reading of this claim limitation, however, is that a debit that is "in an amount of bandwidth usage" requires that this amount of bandwidth usage is deducted from the purchaser's account.  That is, what is debited is not merely something (such as a dollar amount) that corresponds to bandwidth usage.  Rather, the claim recites that the debit itself is an amount of bandwidth usage.  The purchaser's account therefore must hold an amount of bandwidth from which a debit can be taken.

The disclosure cited by Plaintiff regarding "transferring money" does not compel otherwise.  *See* '705 Patent at 20:60–65.  This portion of the specification does not refer to a "purchaser's account," let alone to causing a debit to the purchaser's account in an amount of bandwidth usage.  *See id.*

As to Defendants' proposal of "to be used to purchase an item or service," however, surrounding claim language already recites how the purchaser's account is used in this claim.

Defendants' proposal in this regard would introduce potential redundancy, confusion, or inconsistency and should therefore be omitted from the Court's construction.   Finally, Defendant's proposal reads out the word "purchaser's," which should be included in the construction.

The Court therefore hereby construes **"the purchaser's account"** to mean **"purchaser account capable of holding an amount of bandwidth usage."**

**18.   "causing a debit to the purchaser's account in an amount of bandwidth usage which corresponds to the agreed upon purchase value"**

| **"causing a debit to the purchaser's account in an amount of bandwidth usage which corresponds to the agreed upon purchase value"**<br>('705 Patent, Claim 8) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Subtracting an amount of bandwidth usage that is calculated from a fair market value of the cost of goods being purchased plus a cost of bandwidth used to complete the transaction. |

(Dkt. #30, Ex. A, at p. 4; Dkt. #41-1, at p. 23).

### A.  The Parties' Positions

Plaintiffs argue that the portion of the specification cited by Defendants "merely describ[es] example aspects of one example embodiment."  (Dkt. #37, at p. 23).

Defendants cite their arguments as to "purchaser's account" and "agreed upon purchase value," and Defendants also argue that "it is clear from the prosecution history that the amount debited (*i.e.*, subtracted) from the purchaser's account was understood to be in 'bandwidth' and not other forms of currency as alleged by Plaintiff."  (Dkt. #39, at pp. 21–22) (citation omitted).

Plaintiffs reply by citing their arguments as to the terms "agreed upon purchase value" and "the purchaser's account," which are discussed above.  (*See* Dkt. #40, at pp. 7–9).

### B.  Analysis

As discussed above regarding the term "the purchaser's account," the claim expressly recites that what is debited is not merely something (such as a dollar amount) that *corresponds* to bandwidth usage but rather *is* an amount of bandwidth usage.  The statements of the patent examiner during prosecution (cited here by Defendants) merely confirm this.  (Dkt. #39, Ex. 11, June 10, 2011 Office Action, at p. 7) (p. 37 of 43 of Ex. 11).  Defendants have not, however, persuasively supported their proposal of referring to "fair market value" and "cost of bandwidth used to complete the transaction."

The Court therefore hereby construes **"causing a debit to the purchaser's account in an amount of bandwidth usage which corresponds to the agreed upon purchase value"** to mean **"subtracting an amount of bandwidth usage from the purchaser's account, wherein the subtracted amount of bandwidth usage corresponds to the agreed upon purchase value."**

**19.   "a processor applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification)"**

| "a processor applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification)" ('746 Patent, Claim 9) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f). | The claimed function:     Applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification). |
| In the alternative, to the extent the Court determines that § 112(f) applies to this claim term, the function is applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification), and the associated structure is a microprocessor and equivalents to this structure. | The corresponding structure:     Not disclosed. Therefore, the term is indefinite. |

(Dkt. #30, Ex. A, at p. 5; Dkt. #41-1, at p. 24).

### A. The Parties' Positions

Plaintiffs argue that "[t]he term includes 'processor,' which is, itself, understood to be structure in the computer arts," and Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term.   (Dkt. #37, at p. 25).

Defendants respond that this disputed term "is defined only by the function that it performs" in a format consistent with traditional means-plus-function limitations, and Defendants argue that "[t]he word 'processor' in the context of Blue Spike's claims is a nonce word that essentially replaces the word 'means.'"   (Dkt. #39, at p. 23).   Defendants also argue that "[t]he 'algorithm' is not disclosed in the '746 Patent."   (*Id.*).   Further, Defendants argue that

Plaintiffs rely on a dictionary definition for "processor" that was not timely disclosed and that does not "provide any insight into the structure of a specific 'processor' for applying a specifically claimed, but undisclosed, 'algorithm.'"  (*Id.*, at p. 24) (citation omitted).  Finally, Defendants argue that the brief mention of "software" in the specification is not sufficiently described, let alone linked to the claimed function.  (*Id.*).

Plaintiffs reply that the word "processor" has often been found to connote structure, such that the presumption against means-plus-function treatment is not rebutted.  (*See* Dkt. #40, at pp. 9–10).  Alternatively, Plaintiffs argue that "[t]he specification contains disclosure of how a WID may be created via an algorithm."  (*Id.*, at p. 10) (citing '766 Patent at 11:33–12:25).

### B.  Analysis

Title 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function."  *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply."  *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted).  "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites

function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment.   *Id.* (citation omitted).   *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted).  Instead, *Williamson* found, "[h]enceforth, we will apply the presumption as we have done prior to *Lighting World* . . . ."  *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)).  In a subsequent part of the decision not considered *en banc*, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite because of lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word."  792 F.3d at 1350.

Here, this "processor" term does not use any of the words identified by *Williamson* as a "nonce" word lacking structure.  *See id.*  Although the term "processor" may refer to a broad class of structures, this breadth does not necessarily render the term non-structural.  *See Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (finding "wireless device means" not a means-plus-function term, noting that "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function") (quoting *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013)).  Also, the Federal Circuit recently found that a "processing" term connoted structure:

> As used in the claims of the '591 patent, the term "digital processing unit" clearly serves as a stand-in for a "general purpose computer" or a "central processing unit," each of which would be understood as a reference to structure in this case, not simply any device that can perform a particular function.

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020).   The Court's analysis in *SyncPoint* is also applicable.  *See SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2:15-CV-247, 2016 WL 55118, at *18–*21 (E.D. Tex. Jan. 5, 2016).

The Court therefore hereby expressly rejects Defendants' argument that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.   Defendants present no alternative proposed construction.

The Court accordingly hereby construes **"a processor applying an algorithm to at least (1) a packet watermark and (2) packet content, thereby generating a WID (Watermark Identification)"** to have its **plain meaning** (apart from the Court's constructions of constituent terms).

20.  **"packet watermark protocol"**

<table>
<tr><td colspan="2"> <strong>"packet watermark protocol"</strong><br>('705 Patent, Claim 8) </td></tr>
<tr><td><strong>Plaintiffs' Proposed Construction</strong></td><td><strong>Defendants' Proposed Construction</strong></td></tr>
<tr><td>Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f).<br><br>In the alternative, if any construction is deemed necessary, the construed term should include the full phrase "transmitting a stream of data comprising a plurality of packets using a packet watermark protocol." To the extent the Court determines that § 112(f) applies to this claim term, the function is transmitting a stream of data comprising a plurality of packets using a packet watermark protocol, and the associated structure is a microprocessor and equivalents to this structure.</td><td>The claimed function:<br>    Transmitting a stream of data comprising a plurality of packets.<br><br>The corresponding structure:<br>    Not disclosed. Therefore, the term is indefinite.</td></tr>
</table>

(Dkt. #30, Ex. A, at p. 6; Dkt. #41-1, at pp. 25–26).

## A.  The Parties' Positions

Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term.  (Dkt. #37, at p. 27).

Defendants respond that "[t]his limitation is in a format consistent with traditional means-plus-function claim limitations because 'a packet watermark protocol' is defined only by the function that it performs," and "[t]he word 'protocol' in the context of Blue Spike's claims is a nonce word that essentially replaces the word 'means.'"  (Dkt. #39, at p. 25).  Defendants also argue that "[t]he '705 Patent does not recite a single mathematical formula, flow chart, figure, or any other disclosure of the claimed 'protocol.'"  (*Id.*).  Moreover, Defendants argue, "a POSITA

would not consider a microprocessor a device capable of transmitting a stream of data comprising a plurality of packets." (*Id.*, at p. 26).

Plaintiffs reply that "[t]he limitation at issue is not a structural limitation," and "[i]t is unclear in what way §112(6) is supposed to apply." (Dkt. #40, at pp. 10–11). Plaintiffs also argue that Defendants "give[] no reason to believe 'protocol' is a 'nonce' word equivalent to 'means' rather than the ordinary meaning of 'protocol' as a convention or standard." (*Id.*, at p. 11) (footnote omitted). Further, Plaintiffs argue that "[t]he 'packet watermark protocol' at issue is defined by subsequent claim limitations: (1) 'generating a packet watermark'; and (2) 'combining the packet watermark with each of the . . . packets to form watermarked packets' (claim 8)." (Dkt. #40, at p. 11).

### B. Analysis

Claim 8 of the '705 Patent recites (emphasis added):

8. An electronic method for selling at least one item and/or service said method comprising:
 establishing a communication link between a vending system and a purchasing system; and
 transmitting a stream of data comprising a plurality of packets using a *packet watermark protocol*, said transmitting comprising:
  generating a packet watermark associated with the stream of data wherein the packet watermark enables identification of at least one of the plurality of packets; and
  combining the packet watermark with each of the plurality of packets to form watermarked packets;
  wherein the transmitting is for at least one of the following:
   receiving a request to purchase a selected item;
   determining a purchase value for the selected item;
   causing a debit to the purchaser's account in an amount of bandwidth usage which corresponds to the agreed upon purchase value for the selected item; and
   sending an instruction to deliver the selected item.

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply."  *Williamson*, 792 F.3d at 1348 (citations and internal quotation marks omitted).

Contrary to Defendants' argument, the term "packet watermark protocol" is not recited "in a format consistent with traditional means-plus-function claim limitations" because the term is not recited as being "for" performing a function.  *Id.* at 1350.

On balance, Defendants have not rebutted the presumption against means-plus-function treatment for this non-means term.  The Court hereby expressly rejects Defendants' argument that 35 U.S.C. § 112, ¶ 6 applies, and Defendants present no alternative proposed construction.

The Court therefore hereby construes **"packet watermark protocol"** to have its **plain meaning** (apart from the Court's construction of the constituent term "packet watermark").

21.  "a vending system"

| "a vending system" (’705 Patent, Claim 8) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f).<br><br>In the alternative, if any construction is deemed necessary, the construed term should include the full phrase "establishing a communication link between a vending system and a purchasing system."  To the extent the Court determines that § 112(f) applies to this claim term, the function is establishing a communication link between a vending system and a purchasing system, and the associated structure is a microprocessor and equivalents to this structure. | The claimed function:<br>    Accepting bandwidth usage as a form of payment.<br><br>The corresponding structure:<br>    Not disclosed. Therefore, the term is indefinite. |

(Dkt. #30, Ex. A, at p. 7; Dkt. #41-1, at pp. 26–27).

## A.  The Parties' Positions

Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term.  (Dkt. #37, at p. 28).

Defendants respond that "'system' in the context of claim 8 is a quintessential nonce word."  (Dkt. #39, at p. 27) (citations omitted).  Defendants argue that Plaintiffs' proposed function should be rejected because "[t]here is nothing in the claim to indicate to a POSITA that the function of the vending system itself is to establish a communication link with a purchasing system . . . ."  (*Id.*, at p. 29).  As to Defendants' proposed function, Defendants argue that "[t]he

specification does not provide any structure to perform this claimed function and is therefore indefinite." (*Id.*, at p. 28).

Plaintiffs reply that "[t]he entire invention and limitations of the patent indicate . . . the system at issue is a computer system." (Dkt. #40, at p. 12). Plaintiffs also submit that "[t]he specification is replete with descriptions of vendors and their systems, providing sufficient structure." (*Id.*).

### B. Analysis

Claim 8 of the '705 Patent recites, in relevant part (emphasis added):

8. An electronic method for selling at least one item and/or service said method comprising:
establishing a communication link between a *vending system* and a purchasing system; and
transmitting a stream of data comprising a plurality of packets using a packet watermark protocol, . . .

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson*, 792 F.3d at 1348 (citations and internal quotation marks omitted).

Also, the term "a vending system" is not recited "in a format consistent with traditional means-plus-function claim limitations" because the term is not recited as being "for" performing a function. *Id.* at 1350. Further, the specification uses "vending" and "vending machine" to refer to structures that would be understood in common parlance. *See* '705 Patent at 22:1–42.

The district court decisions cited by Defendants regarding "system" terms in other patents are not binding on this Court and are unpersuasive. *See Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*, No. 1-14-cv-134-LY, 2015 WL 4937464, at *5 (W.D. Tex. Aug. 18, 2015) ("The court finds that 'system,' as used in the claim, functions merely as a 'nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the

term 'means for.'") (citations omitted); *see also Dyfan, LLC v. Target Corp.*, No. W-19-CV-00179-ADA, 2020 WL 8617821, at *8 (W.D. Tex. Nov. 24, 2020).

On balance, Defendants have not rebutted the presumption against means-plus-function treatment for this non-means term. The Court hereby expressly rejects Defendants' argument that 35 U.S.C. § 112, ¶ 6 applies, and Defendants present no alternative proposed construction.

The Court therefore hereby construes **"a vending system"** to have its **plain meaning**.

## 22. "a purchasing system"

| "a purchasing system" (’705 Patent, Claim 8) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f).<br><br>In the alternative, if any construction is deemed necessary, the construed term should include the full phrase "establishing a communication link between a vending system and a purchasing system." To the extent the Court determines that § 112(f) applies to this claim term, the function is establishing a communication link between a vending system and a purchasing system, and the associated structure is a microprocessor and equivalents to this structure. | The claimed function:<br>    Facilitating the purchasing of a good or service through bandwidth usage as a form of payment.<br><br>The corresponding structure:<br>    Not disclosed. Therefore, the term is indefinite. |

(Dkt. #30, Ex. A, at p. 8; Dkt. #41-1, at pp. 27–28).

### A. The Parties' Positions

Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term. (Dkt. #37, at p. 30).

Defendants respond that "'system' in claim 8 is a quintessential nonce word."  (Dkt. #39, at p. 31).  As to the proper function, Defendants argue that "[b]ased upon the language of the claim, a POSITA would understand that the 'purchasing system' must facilitate the purchasing of a good or service through bandwidth usage as a form of payment, in order for other elements of the claim to be meaningful, such as 'causing a debit to the purchaser's account in an amount of bandwidth usage which corresponds to the agreed upon purchase value for the selected item.'" (*Id.*).  As to Plaintiffs' proposed function, Defendants argue that "[t]here is nothing in the claim to indicate that the function of the purchasing system itself is to establish a communication with a vending system, nor is there any disclosure whatsoever in the specification in support of a purchasing system having such functionality . . . ."  (*Id.*, at p. 32).  Further, Defendants argue that Plaintiffs' proposal of a "microprocessor" as corresponding structure is insufficient for performing the claimed function.  (*See id.*, at pp. 32–33).

Plaintiffs reply that "[p]urchasing systems are described throughout the specification and are the logical counterpart to vendors or 'vending systems' in that purchases [*sic*, purchasers] would purchase the goods and/or services made available by vendors."  (Dkt. #40, at p. 13) (citation omitted).

### B.  Analysis

Claim 8 of the '705 Patent recites, in relevant part (emphasis added):

8.  An electronic method for selling at least one item and/or service said method comprising:
    establishing a communication link between a vending system and *a purchasing system*; and
    transmitting a stream of data comprising a plurality of packets using a packet watermark protocol, . . .

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson*, 792 F.3d at 1348 (citations and internal quotation marks omitted).

Also, the term "a purchasing system" is not recited "in a format consistent with traditional means-plus-function claim limitations" because the term is not recited as being "for" performing a function. *Id.* at 1350. The district court decisions cited by Defendants regarding "system" terms in other patents are not binding on this Court and are unpersuasive. *See Joao Control & Monitoring Sys., LLC v. Protect America, Inc.*, No. 1-14-cv-134-LY, 2015 WL 4937464, at *5 (W.D. Tex. Aug. 18, 2015) ("The court finds that 'system,' as used in the claim, functions merely as a 'nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'") (citations omitted); *see also Dyfan, LLC v. Target Corp.*, No. W-19-CV-00179-ADA, 2020 WL 8617821, at *8 (W.D. Tex. Nov. 24, 2020).

On balance, Defendants have not rebutted the presumption against means-plus-function treatment for this non-means term. The Court hereby expressly rejects Defendants' argument that 35 U.S.C. § 112, ¶ 6 applies, and Defendants present no alternative proposed construction.

The Court therefore hereby construes **"a purchasing system"** to have its **plain meaning**.

23. **"application software"**

| **"application software"** ('602 Patent, Claim 1) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | A complete set of executable commands containing a memory scheduler resource which can be called periodically, or at random or pseudo random intervals, at which time it intentionally shuffles the other code resources randomly in memory, so that someone trying to analyze snapshots of memory at various intervals cannot be sure if they are looking at the same code or organization from one "break" to the next. |

(Dkt. #30, Ex. A, at p. 9; Dkt. #41-1, at pp. 28–29).

## A.  The Parties' Positions

Plaintiffs argue that "Defendants are attempting to use example aspects of the 'second method' and read it into the claim language, ignoring at least example aspects of the 'first method.'"  (Dkt. #37, at p. 32).

Defendants respond: "The vague terms 'application software' and 'software product' are not terms that have a known meaning to a POSITA and the patents specifically define 'application software.' [fn: Because the '602 and '842 patent share a specification, Grande proposes that these terms should be construed the same as they are used in an identical manner.]"  (Dkt. #39, at p. 34 & n.4).   Defendants argue that "Grande's proposed construction of 'application software' is a nearly verbatim recitation of the 'present invention' as described by the patentee," and "where there is only a single embodiment disclosed, as here, it is proper to construe the limitation to include the only relevant disclosure."  (*Id.*, at p. 35) (citation omitted).

Plaintiffs reply that "[e]xample aspects of a single embodiment are not mandatory aspects of every embodiment."  (Dkt. #40, at p. 13).

### B.  Analysis

The portion of the specification cited by Defendants discloses:

> *Under the present invention*, the application contains a special code resource which knows about all the other code resources in memory.  During execution time, this special code resource, called a "memory scheduler," can be called periodically, or at random or pseudo random intervals, at which time it intentionally shuffles the other code resources randomly in memory, so that someone trying to analyze snapshots of memory at various intervals cannot be sure if they are looking at the same code or organization from one "break" to the next.

'602 Patent at 15:36–45 (emphasis added).

Even assuming (without deciding) that disclosure "under" the present invention refers to the claimed invention as a whole, Defendants do not show that this disclosure sets forth a definition of the term "application software" or "software product."  Thus, Defendants do not show that the patentee "*clearly set forth* a definition of the disputed claim term in either the specification or prosecution history."  *CCS Fitness*, 288 F.3d at 1366 (emphasis added).  Further, Defendants rely on *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017), but in that case the Federal Circuit fond that limiting the term "efficient mixing" to a particular disclosed example was "necessary to 'tether the claims to what the specification[] indicate[s] the inventor actually invented."  *Id.* (citation and internal quotation marks omitted).  In the present case, the term "application software" refers to a well-known class of structures and is not a term of degree.  Indeed, "[b]readth is not indefiniteness."  *Athletic Alternatives*, 73 F.3d at 1583 (quoting *In re Gardner*, 427 F.2d at 788).

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and

should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"application software"** to have its **plain meaning**.

### 24. "a license code"

| **"a license code"**<br>('602 Patent, Claim 1) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | A predetermined unique sequence of characters, given to a licensed user, and exclusively used for generating a decoding key. |

(Dkt. #30, Ex. A, at p. 9; Dkt. #41-1, at p. 29).

### A. The Parties' Positions

Plaintiffs argue that "example descriptions of 'a license code' can be found throughout the specification," and "Defendants' proposed construction has zero support in the intrinsic record and should be rejected."  (Dkt. #37, at p. 33).

Defendants respond that "the term 'a license code' as used throughout the '602 patent does not have a known meaning to a POSITA in the context of this patent," and "a POSITA would have to glean the meaning of 'a license code' from the specification."  (Dkt. #39, at p. 36). Defendants argue that their proposed construction is supported by the specification and "is necessary to provide clarity to a POSITA and the jury as to the meaning of this disputed term." (*Id.*, at p. 37; *see id.* at pp. 36–37).

Plaintiffs reply that "[n]othing in the specification limits the license code to a 'unique sequence of characters,' let alone a predetermined one," and "[s]imilarly, nothing in the specification limits the license code to being '*exclusively* used for generating a decoding key.'"

At the October 20, 2021 hearing, Plaintiffs argued that because a "license code" could be based on computer configuration information, the license code could be dynamically generated rather than necessarily being predetermined.

### B.  Analysis

Claim 1 of the '602 Patent recites (emphasis added):

1.    A computer based method for accessing functionality provided by an application software comprising:
        storing said application software in non transient memory of a computer;
        said application software in said computer prompting a user to enter into said computer personalization information;
        said application software storing, in said non transient memory, in a personalization data resource, both computer configuration information of said computer, and a *license code* entered in response to said prompting;
        said application software in said computer generating a proper decoding key, said generating comprising using said *license code*; and
        wherein said application software, in said computer, cannot access at least one encoded code resource of said application software, unless said *license code* is stored in said personalization data resource.

The claim thus recites that the step of generating a decoding key must include using the license code.  This does not, however, go so far as to support Defendants' proposal of "*exclusively* used for generating a decoding key," and Defendants do not otherwise provide adequate support for such a limitation.

The specification discloses:

The assembly utility can be supplied with a key generated from a license code generated for the license in question.  Alternatively, the key, possibly random, can be stored as a data resource and encrypted with a derivative of the license code.  Given the key, it encodes one or several essential resources into one or several data resources.

* * *

> Note that the application can be copied in an uninhibited manner, but must contain the *license code issued to the licensed owner*, to access its essential code resources.  The goal of the invention, copyright protection of computer code and establishment of responsibility for copies, is thus accomplished.

'602 Patent at 13:45–50 & 14:1–6 (emphasis added).

The disclosures cited by Defendants do not support Defendants' proposal that a license code must be "unique."  Likewise, Defendants do not support their proposal of requiring a "sequence of characters."  Nonetheless, these disclosures support Defendants' proposal that a "license code" is issued to a licensed user, particularly when read in the context of the above-reproduced claim language, which recites that a license code is entered in response to "prompting a user to enter" information.

Finally, as to Defendants' proposal that a license code is "predetermined," Claim 7 of the '602 Patent recites that "said license code is a function of said computer configuration information."  This recital of using computer configuration information weighs against Defendants' proposal of requiring a "license code" to be determined in advance.

On balance, the Court hereby construes **"a license code"** to mean **"a code that is issued to a licensed user and that can be used for generating a decoding key."**

### 25.  "decoding key"

| "decoding key" ('602 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | A series of bits generated from the license code and that is used to decrypt the encoded code resource. |

(Dkt. #30, Ex. A, at p. 9; Dkt. #41-1, at p. 30).

## A.  The Parties' Positions

Plaintiffs argue that "the claim language is clear to one skilled in the art on its face," and "Defendants' proposed construction is unsupported by the intrinsic record and should be rejected."  (Dkt. #37, at p. 34).

Defendants respond that "claim 1 of the '602 patent expressly states that the 'decoding key' is generated by using the 'license code,'" and "the *only* use of the term 'decoding key' in the '602 patent teaches that the 'decoding key' is used to 'access the essential code resources.'" (Dkt. #39, at p. 37).  "Additionally," Defendants argue, "the '602 patent expressly discloses that a 'key' is a 'series of bits.'"  (*Id.*, at p. 38) (citing '602 Patent at 8:11–13).

Plaintiffs reply that "[t]he specification discusses 'encrypted'/'decrypted' separately from 'encoded'/'decoded.'"  (Dkt. #40, at p. 14) (citing '602 Patent at 9:34–57 & 13:47–50).

## B.  Analysis

Claim 1 of the '602 Patent recites (emphasis added):

1.    A computer based method for accessing functionality provided by an application software comprising:
       storing said application software in non transient memory of a computer;
       said application software in said computer prompting a user to enter into said computer personalization information;
       said application software storing, in said non transient memory, in a personalization data resource, both computer configuration information of said computer, and a license code entered in response to said prompting;
       said application software in said computer generating a proper *decoding key*, said generating comprising using said license code; and
       wherein said application software, in said computer, cannot access at least one encoded code resource of said application software, unless said license code is stored in said personalization data resource.

Defendants do not persuasively support their proposal of requiring "decrypt."  To whatever extent the parties imply a broader dispute as to whether the specification uses

"encrypted" and "decrypted" interchangeably with "encoded" and "decoded," respectively, it is sufficient to simply reject Defendants' proposed construction in this regard.

As to the remainder of Defendants' proposal, the specification discloses:

> According to an embodiment of the present invention, a predetermined, or randomly generated, key is used to scramble digital information in a way that is unlike known "digital watermark" techniques and public key crypto-systems. *As used herein*, a key is also referred to as a "mask set" which includes one or more random or pseudo-random *series of bits*.

'602 Patent at 8:7–13 (emphasis added).

Although this disclosure begins by referring to "an embodiment," the statement regarding a key "[a]s used herein" provides insight into the meaning of "key" more generally. *See id.* Further, surrounding claim language (reproduced above) demonstrates that a "decoding key" can be used to decode an "encoded code resource."

Finally, as to Defendants' proposal that the series of bits must be generated from the license code, the specification discloses that "[a]lternatively" the key may be "random." '602 Patent at 13:45–50 (emphasis added).

At the October 20, 2021 hearing, the Court proposed construing this disputed term to mean "a series of bits that can be used to decode an encoded code resource." Defendants agreed with the Court's proposed construction. Plaintiffs' counsel expressed agreement but also expressed a desire to confer with co-counsel after the conclusion of the hearing. In a written submission after the hearing, Plaintiffs presented no objection. (*See* Dkt. #49.) Thus, in addition to the discussion set forth above, the parties appear to agree with the Court's conclusion.

The Court therefore hereby construes **"decoding key"** to mean **"a series of bits that can be used to decode an encoded code resource."**

### 26.  "configuration information"

<table>
<tr>
<td colspan="2" align="center">**"configuration information"**<br>('602 Patent, Claim 1)</td>
</tr>
<tr>
<td>**Plaintiffs' Proposed Construction**</td>
<td>**Defendants' Proposed Construction**</td>
</tr>
<tr>
<td>No construction necessary</td>
<td>Indefinite</td>
</tr>
</table>

(Dkt. #30, Ex. A, at p. 10; Dkt. #41-1, at p. 31).

### A.  The Parties' Positions

Plaintiffs argue that "[t]he term 'configuration information' speaks for itself against Defendants' assertion [of indefiniteness]," and "[s]uch a concept is used throughout the specification . . . ."  (Dkt. #37, at p. 35).

Defendants argue that "[t]he '602 patent is *silent* as to what 'computer configuration information' means, or what information is stored in the application software."  (Dkt. #39, at p. 38).   Further, Defendants argue that Plaintiffs rely on a definition that was not timely disclosed, that post-dates the priority date of the '602 Patent by over twenty years, and that "is for the word 'configuration,' not for the claim language computer 'configuration information.'"  (*Id.*, at p. 39).

Plaintiffs reply:

> To the extent Grande asserts Blue Spike is importing an extrinsic definition, Blue Spike makes no assertion that "configuration information" must be construed in accordance with the Merriam-Webster dictionary.   Additionally, Grande ignores the Amendment filed on 10/22/2014 at 6 from the prosecution history and Blue Spike's cites in its Opening Brief (Dkt. 37 at 34–35).

(Dkt. #40, at p. 14).

At the October 20, 2021 hearing, Defendants argued that it is unclear what the term "configuration information" would encompass.

### B.  Analysis

Claim 1 of the '602 Patent recites (emphasis added):

1.   A computer based method for accessing functionality provided by an application software comprising:
       storing said application software in non transient memory of a computer;
       said application software in said computer prompting a user to enter into said computer personalization information;
       said application software storing, in said non transient memory, in a personalization data resource, both *computer configuration information of said computer*, and a license code entered in response to said prompting;
       said application software in said computer generating a proper decoding key, said generating comprising using said license code; and
       wherein said application software, in said computer, cannot access at least one encoded code resource of said application software, unless said license code is stored in said personalization data resource.

The specification discloses:

The application can . . . operate as follows:

1) when it is run for the first time, after installation, it asks the user for personalization information, which includes the license code.  This can include a *particular computer configuration*;

2) it stores this information in a personalization data resource;

3) Once it has the license code, it can then generate the proper decoding key to access the essential code resources.

Note that the application can be copied in an uninhibited manner, but must contain the license code issued to the licensed owner, to access its essential code resources.

'602 Patent at 13:59–14:3 (emphasis added).

This disclosure regarding a "particular computer configuration" provides sufficient context for understanding the term "configuration information," particularly when read as part of the phrase "computer configuration information of said computer" in the claim (reproduced above).

On balance, Defendants do not meet their burden to show that the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129; *see Sonix*, 844 F.3d at 1377.   Defendants present no alternative proposed construction.

The Court therefore hereby construes **"configuration information"** to have its **plain meaning**.

### 27.  "personalization data resource"

| "personalization data resource" ('602 Patent, Claim 1) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite |

(Dkt. #30, Ex. A, at p. 10; Dkt. #41-1, at p. 32).

### A.  The Parties' Positions

Plaintiffs argue that "[t]he term 'personalization data resource' speaks for itself against Defendants' assertion [of indefiniteness]" and "is supported throughout the specification."  (Dkt. #37, at p. 36).

Defendants respond:

> The term "personalization data resource" is used only *once* in the '602 patent (13:64–65), which states that the application "stores [personalization] information" and "computer configuration information" in a "personalization data resource."  Outside of this conclusory use [of] this term, the '602 patent does not provide any context regarding what this language means.  After reviewing the specification of the '602 patent, and the one reference to "personalization data resource," a POSITA would not be reasonably informed as to the scope of the claim.

(Dkt. #39, at p. 39).

Plaintiffs reply: "Grande asserts that it is 'confus[ed].'  ([Dkt. #39] at 40).  Blue Spike cited intrinsic evidence of a 'resource' and 'personalization data' (Dkt. [#37] at 35–36).  This is not confusing."  (Dkt. #40, at p. 14).

At the October 20, 2021 hearing, Defendants argued that it is unclear what information would be stored in a "personalization data resource."

### B.  Analysis

Claim 1 of the '602 Patent recites (emphasis added):

1.    A computer based method for accessing functionality provided by an application software comprising:
        storing said application software in non transient memory of a computer;
        said application software in said computer prompting a user to enter into said computer personalization information;
        said application software storing, in said non transient memory, in a *personalization data resource*, both computer configuration information of said computer, and a license code entered in response to said prompting;
        said application software in said computer generating a proper decoding key, said generating comprising using said license code; and
        wherein said application software, in said computer, cannot access at least one encoded code resource of said application software, unless said license code is stored in said *personalization data resource*.

Because the claim sets forth the "personalization data resource" as merely storing computer configuration information and a license code, the term is readily understandable and the claim does not give rise to any confusion.  *See, e.g., Phillips*, 415 F.3d at 1314.

On balance, Defendants do not meet their burden to show that the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129; *see Sonix*, 844 F.3d at 1377.  Defendants present no alternative proposed construction.

The Court therefore hereby construes **"personalization data resource"** to have its **plain meaning**.

28.  "encoded code resource"

| **"encoded code resource"** ('602 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | A set of executable code that is encrypted using a key derived from the license code. |

(Dkt. #30, Ex. A, at p. 10; Dkt. #41-1, at p. 34).

## A.  The Parties' Positions

Plaintiffs argue that "the claim language is clear to one skilled in the art on its face," and "the specification discusses 'encrypted' separately from 'encoded.'"  (Dkt. #37, at 37).

Defendants respond that their proposed construction "comes directly from the specification," and "the specification uses 'encode' and 'encrypt' with respect to the 'code resource' interchangeably."  (Dkt. #39, at pp. 40 & 41).

Plaintiffs reply that "[j]ust because a key can be 'encrypted,' does not mean that a resource must be 'encrypted,'" and "[t]hese are separate, non-interchangeable terms that should not be understood as such."  (Dkt. #40, at p. 15).

At the October 20, 2021 hearing, the Court proposed construing this disputed term to mean "a set of executable code that is encoded using a key."  Plaintiff raised no specific concerns but expressed uncertainty as to whether Plaintiff could agree to the Court's proposed construction.  Defendants maintained its proposal that the construction should refer to the "encoded code resource" being "derived from the license code."

## B.  Analysis

Claim 1 of the '602 Patent recites (emphasis added):

1.    A computer based method for accessing functionality provided by an application software comprising:

storing said application software in non transient memory of a computer;

said application software in said computer prompting a user to enter into said computer personalization information;

said application software storing, in said non transient memory, in a personalization data resource, both computer configuration information of said computer, and a license code entered in response to said prompting;

said application software in said computer generating a proper decoding key, said generating comprising using said license code; and

wherein said application software, in said computer, cannot access at least one *encoded code resource* of said application software, unless said license code is stored in said personalization data resource.

The specification discloses:

For the *encoding of the essential code resources*, a "key" is needed.  Such a key is similar to those described in U.S. Pat. No. 5,613,004, the "Steganographic Method and Device" patent.

\* \* \*

The assembly utility can be supplied with a *key generated from a license code* generated for the license in question.  *Alternatively, the key, possibly random*, can be stored as a data resource and encrypted with a derivative of the license code. Given the key, it *encodes* one or several essential resources into one or several data resources.

'602 Patent at 13:28–31 & 13:45–50 (emphasis added).

First, Defendants do not persuasively support their proposal of requiring "encrypted."  To whatever extent the parties imply a broader dispute as to whether the specification uses "encrypted" and "decrypted" interchangeably with "encoded" and "decoded," respectively, it is sufficient to simply reject Defendants' proposed construction in this regard.

Second, Defendants propose requiring using "a key derived from the license code," but the above-reproduced portions of the specification disclose that, "[a]lternatively," the key may be "random" rather than derived from the license code.

The Court therefore hereby construes **"encoded code resource"** to mean **"a set of executable code that is encoded using a key."**

### 29.  "A computer based method for accessing functionality provided by an application software"

| "A computer based method for accessing functionality provided by an application software" ('602 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Preamble is limiting. |

(Dkt. #30, Ex. A, at p. 10; Dkt. #41-1, at p. 35).

### A.  The Parties' Positions

Plaintiffs submit: "Blue Spike does not disagree that claim 1 is 'A computer based method for accessing functionality provided by an application software,' but neither party is proposing any construction of this term other than that it is a limitation."  (Dkt. #37, at p. 38).

Defendants respond that "the preamble of claim 1 should be treated as a limitation as the preamble provides antecedent basis for the term 'an application software' and is necessary to understand the limitations in the body of the claim."  (Dkt. #39, at p. 41) (citation omitted).

Plaintiffs reply that "Grande still does not propose a construction and merely adds work for the Court."  (Dkt. #40, at p. 15).

At the October 20, 2021 hearing, the parties agreed that the preamble provides antecedent basis for "said application software."

### B.  Analysis

Claim 1 of the '602 Patent recites (emphasis added):

1.   *A computer based method for accessing functionality provided by an application software* comprising:

  storing *said application software* in non transient memory of a computer;
  *said application software* in said computer prompting a user to enter into said computer personalization information;
  *said application software* storing, in said non transient memory, in a personalization data resource, both computer configuration information of said computer, and a license code entered in response to said prompting;
  *said application software* in said computer generating a proper decoding key, said generating comprising using said license code; and
  wherein *said application software*, in said computer, cannot access at least one encoded code resource of *said application software*, unless said license code is stored in said personalization data resource.

Plaintiffs do not dispute that the preamble is limiting.  Also of note, the preamble provides antecedent basis for the recital of "said application software" in the body of the claim. Particularly in light of this antecedent basis, relevant authorities support Defendants' contention that the preamble is limiting.  *See, e.g., Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."); *Pacing Techs., LLC v. Garmin Int'l, Inc.,* 778 F.3d 1021, 1023–24 (Fed. Cir. 2015) (similar); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (discussing general principles of whether preamble is limiting).

The Court therefore hereby finds that **the preamble of Claim 1 of the '602 Patent is limiting**.

### 30.  "software product"

| "software product" | |
| ('842 Patent, Claim 11) | |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | A complete set of executable commands containing a memory scheduler resource which can be called periodically, or at random or pseudo random intervals, at which time it intentionally shuffles the other code resources randomly in memory, so that someone trying to analyze snapshots of memory at various intervals cannot be sure if they are looking at the same code or organization from one "break" to the next. |

(Dkt. #30, Ex. A, at p. 11; Dkt. #41-1, at p. 36).

### A.  The Parties' Positions

Plaintiffs argue that, as with the term "application software" (discussed above), "Defendants are attempting to use example aspects of the 'second method' and impart it into the claim language, ignoring example aspects of the 'first method.'"  (Dkt. #37, at p. 38).

Defendants present their argument as to this term together with Defendants' argument as to the term "application software," which is discussed above.  (*See* Dkt. #39, at pp. 34–35 & n.4).

Plaintiffs likewise reply as to this term together with the term "application software," which is discussed above.  (*See* Dkt. #40, at p. 13).

### B.  Analysis

The portion of the specification cited by Defendants discloses:

*Under the present invention*, the application contains a special code resource which knows about all the other code resources in memory.  During execution time, this special code resource, called a "memory scheduler," can be called periodically, or at random or pseudo random intervals, at which time it

> intentionally shuffles the other code resources randomly in memory, so that someone trying to analyze snapshots of memory at various intervals cannot be sure if they are looking at the same code or organization from one "break" to the next.

'602 Patent at 15:36–45 (emphasis added).

Even assuming (without deciding) that disclosure "under" the present invention refers to the claimed invention as a whole, Defendants do not show that this disclosure sets forth a definition of the term "application software" or "software product."  Defendants do not show that the patentee "*clearly set forth* a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness*, 288 F.3d at 1366 (emphasis added).

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"software product"** to have its **plain meaning**.

### 31. "license information"

| "license information" ('842 Patent, Claim 11) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Information that is fixed before final assembly of the software product, cannot be changed at the option of the user, and that is entered by the user to decrypt information encoded into the software product. |

(Dkt. #30, Ex. A, at p. 11; Dkt. #41-1, at pp. 36–37).

### A.  The Parties' Positions

Plaintiffs argue that "[e]xample descriptions of 'license information' and/or 'licensing information' can be found throughout the specification," and "Defendants' proposal has zero support in the intrinsic record."  (Dkt. #37, at p. 40).

Defendants respond that "to understand this term, a POSITA would need guidance from the '842 patent, which expressly defines 'license information' . . . ."  (Dkt. #39, at p. 42).

Plaintiffs reply: "Grande misunderstands 'encoding' versus 'encrypting.'  'Decrypting' information that is 'encoded' does not make sense in light of the specification.   These are separate, non-interchangeable terms."  (Dkt. #40, at p. 15).

At the October 20, 2021 hearing, Plaintiff agreed that referring to a user is appropriate, but Plaintiff maintained that other claim language addresses the entering of license information.

### B.  Analysis

Claim 11 of the '842 Patent recites (emphasis added):

11.  A method for licensed software use, the method comprising:
    loading a software product on a computer, said computer comprising a processor, memory, an input, and an output, so that said computer is programmed to execute said software product;
    said software product outputting a prompt for input of *license information*; and
    said software product using *license information* entered via said input in response to said prompt in a routine designed to decode a first license code encoded in said software product.

The specification discloses:

*This invention* represents a significant improvement over prior art because of the inherent difference in use of purely informational watermarks versus watermarks which contain executable object code. . . . In order to extract a digital watermark, the user *must* have a key.  The key, in turn, is a function of the *license information* for the copy of the software in question.  *The key is fixed prior to final assembly* of the application files, and so *cannot be changed at the option of the user*.  That, in turn, means the *license information* in the software copy *must* remain fixed, so that the correct key is available to the software.   The key and the license

information are, in fact, interchangeable.  One is merely more readable than the other.

'842 Patent at 14:7–25 (emphasis added); *see id.* at 7:20–28 ("ensuring that licensing information must be preserved in descendant copies from an original").

"When a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention."  *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).

Here, the above-reproduced disclosure describes "license information" in the context of the "invention" as a whole and describes the key and the license information using mandatory language, such as "must."  *See* '842 Patent at 14:7–24.  As to Defendants' proposal of "decrypt information encoded into the software product," however, Defendants do not persuasively support their proposal of "decrypt," and other language in the claim (reproduced above) already recites using the license information "in a routine designed to decode a first license code encoded in said software product."

The Court therefore hereby construes **"license information"** to mean **"information that is fixed before final assembly of the software product, that cannot be changed at the option of the user, that can be entered by a user, and that can be used to decode other information."**

**32.  "a routine designed to decode a first license code encoded in said software product"**

| **"a routine designed to decode a first license code encoded in said software product"** ('842 Patent, Claim 11) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f).<br><br>In the alternative, if any construction is deemed necessary, the construed term should include the full phrase "said software product using license information entered via said input in response to said prompt in a routine designed to decode a first license code encoded in said software product." To the extent the Court determines that § 112(f) applies to this claim term, the function is using license information entered via said input in response to said prompt in a routine designed to decode a first license code encoded in said software product, and the associated structure is a microprocessor and equivalents to this structure. | The claimed function:<br>    Decoding a first license code encoded in said software product.<br><br>The corresponding structure:<br>    Not disclosed. Therefore, the term is indefinite.<br><br>In addition, this term is also indefinite as to "license code." |

(Dkt. #30, Ex. A, at p. 12; Dkt. #41-1, at pp. 37–38).

### A.  The Parties' Positions

Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term.  (Dkt. #37, at p. 41).  As to Defendants' argument that "license code" is indefinite, Plaintiffs submits that Defendants' argument is inconsistent with Defendants' proposal of a construction for "license code" in the '602 Patent (discussed above). (*Id.*, at pp. 41–42).

Defendants respond that "[t]he word 'routine' in the context of Blue Spike's claims is a nonce word that essentially replaces the word 'means,'" and "a POSITA would not understand the generic 'routine' to impart any specific known structure that can perform this specifically claimed function." (Dkt. #39, at pp. 43 & 44) (citation omitted). Defendants further argue that "[t]he specification does not recite *any* 'routine' to accomplish this function, and indeed does not recite the word 'routine' a single time," and "[t]he specification provides *no* structure capable of performing the functions." (*Id.*, at p. 44) (citation omitted). As to Plaintiffs' proposal of a "microprocessor," Defendants respond that "the specification does not provide any disclosure of a generic 'microprocessor' performing this function." (*Id.*). Finally, Defendants argue that whereas "license code" in the '602 Patent "is a code shared with the user so that the user can input the code into the software to gain access to the software," "[i]n the '842 patent claims, however, the 'license code' is now inexplicable 'encoded' within the software product," and "[s]uch a concept is not disclosed in the '842 and '602 patents." (*Id.*, at p. 45).

Plaintiffs reply that Defendants do not present sufficient evidence to overcome the presumption against means-plus-function treatment for this non-means term. (Dkt. #40, at p. 15). Alternatively, Plaintiffs argue that "[t]he function is the entirety of th[e] phrase," and "[t]he associated structure is a microprocessor and equivalents to this structure because that is what is 'execut[ing]' the 'software product' that has the recited 'routine.'" (*Id.*) (citation omitted). Plaintiffs further reply that "Grande alleges 'license code' is indefinite in claim 11 because the term is supposedly used in a 'drastically different' way than in the '602 patent even though the '602 patent and '842 patent share a specification." (*Id.*, at p. 16) (citation omitted).

### B. Analysis

Claim 11 of the '842 Patent recites (emphasis added):

11.  A method for licensed software use, the method comprising:

loading a software product on a computer, said computer comprising a processor, memory, an input, and an output, so that said computer is programmed to execute said software product;

said software product outputting a prompt for input of license information; and

said software product using license information entered via said input in response to said prompt in *a routine designed to decode a first license code encoded in said software product*.

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply."  *Williamson*, 792 F.3d at 1348 (citations and internal quotation marks omitted).  On balance, Defendants have not rebutted the presumption against means-plus-function treatment for this non-means term.  The Court hereby expressly rejects Defendants' argument that 35 U.S.C. § 112, ¶ 6 applies, and Defendants present no alternative proposed construction.

As to Defendants' argument that the term "license code" is indefinite, the '842 Patent and the '602 Patent are related through continuation applications and therefore share the same written description.  The term "license code" should therefore be interpreted in the same manner in both patents.  *See, e.g., NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).  Defendants argue that the '842 Patent is unclear as to how a license code can be "encoded" in a software product.  On balance, Defendants do not meet their burden to show that the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129; *see Sonix*, 844 F.3d at 1377.  For example, Defendants do not show that a predetermined license code could not itself be decoded (or otherwise extracted) and then subsequently used for generating a decoding key.

Defendants present no alternative proposed construction for "a routine designed to decode a first license code encoded in said software product."

The Court therefore hereby construes **"a routine designed to decode a first license code encoded in said software product"** to have its **plain meaning**.

### 33.  "LCS domain"

| "LCS domain" ('295 Patent, Claim 13) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary<br><br>Alternatively:<br>    A secure medium or area where digital content can be stored, with an accompanying rule system for transfer of digital content in and out of the LCS Domain. | A secure medium or area where digital content can be stored, with an accompanying rule system for restricting transfer of digital content in and out of the medium or hardware.[2] |

(Dkt. #30, Ex. A, at p. 13; Dkt. #37, at p. 43; Dkt. #41-1, at p. 38).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants' proposal is another effort to read into the claims an example from the specification."  (Dkt. #37, at p. 42).  Alternatively, Plaintiffs submit:

> To the extent the court finds the "DEFINITIONS" section controlling, Blue Spike proposes the definition used in this section: "A secure medium or area where digital content can be stored, with an accompanying rule system for transfer of digital content in and out of the LCS Domain." (8:19–21).  Defendants' proposal adds the word "restricting," which has zero support in the intrinsic record and should be rejected.

(*Id.*, at p. 43).

Defendants respond that "Grande's proposed construction is a verbatim recitation of the express definition provided by the patentee," and "Grande's original proposed construction

---

[2] Defendants previously proposed: "A secure medium or area where digital content can be stored, with an accompanying rule system for *restricting* transfer of digital content in and out of the medium or hardware." (Dkt. #30, Ex. A, at p. 13) (emphasis added).

inadvertently included the word 'restricting' before 'transfer,' but Grande removes 'restricting' from its proposed construction to align its construction with the express definition in the '295 patent."  (Dkt. #39, at p. 45).

Plaintiffs reply that "Grande ignores Blue Spike's numerous citations (Dkt. 37 at 42–43) indicating the 'DEFINITIONS' section merely indicates example definitions that should not be imparted into 'LCS Domain.'"  (Dkt. #40, at p. 16) (citation omitted).

### B.  Analysis

The '295 Patent includes a Definitions section that discloses:

> LCS Domain: A secure medium or area where digital content can be stored, with an accompanying rule system for transfer of digital content in and out of the LCS Domain.  The domain may be a single device or multiple devices—all of which have some common ownership or control.  Preferably, a LCS domain is linked to a single purchasing account.  Inside the domain, one can enjoy music or other digital data without substantial limitations—as typically a license extends to all personal use.

'295 Patent at 8:19–27; *see id.* at 7:63 ("DEFINITIONS").

Plaintiffs argue that this Definitions section relates to particular embodiments, but the statement cited by Plaintiffs appears at the end of the Summary section and states: "We now define components of the preferred embodiments for methods, systems, and devices."  *Id.* at 7:60–61.  Read fairly, this statement affirms that the Definitions section relates to the entire specification.  *See id.*

The patentee thus "clearly set forth a definition of the disputed claim term in . . . the specification," *CCS Fitness*, 288 F.3d at 1366, and "[i]n such cases, the inventor's lexicography governs," *Phillips*, 415 F.3d at 1316.  The Court thus having rejected Plaintiffs' argument that this "Definition" is merely an example, the Court adopts Plaintiffs' alternative proposed construction, which comports with the above-reproduced lexicography and which is substantially

the same as the construction proposed by Defendants.  Also, at the October 20, 2021 hearing, Defendants had no objection to a word-for-word adoption of the definition set forth in the specification.

The Court therefore hereby construes **"LCS domain"** to mean **"a secure medium or area where digital content can be stored, with an accompanying rule system for transfer of digital content in and out of the LCS Domain."**

### 34. "devices outside [an] LCS"

| "devices outside [an] LCS" ('295 Patent, Claim 13) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Devices not controlled by the LCS domain processor. |

(Dkt. #30, Ex. A, at p. 13; Dkt. #41-1, at p. 40).

### A.  The Parties' Positions

Plaintiffs argue that "the claim language is clear to one skilled in the art on its face," and "Defendants' proposal has zero support in the intrinsic record and should be rejected."  (Dkt. #37, at p. 44).

Defendants argue that their proposed construction "aligns with the plain and ordinary meaning of this limitation" and is consistent with the specification.  (Dkt. #39, at p. 46).

Plaintiffs reply: "Grande cites to the specification, but then adds additional, unsupported language to its construction.  The term is clear on its face.  Grande's construction has zero support."  (Dkt. #40, at p. 17).

### B.  Analysis

Claim 13 of the '295 Patent recites (emphasis added):

13.   A method for using a local content server system (LCS), said LCS comprising an LCS communications port; an LCS storage unit for storing digital data in non-transitory form; an LCS domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and *devices outside said LCS*, thereby defining a first LCS domain; and a programmable address module programmed with an LCS identification code uniquely associated with said LCS domain processor; comprising:
    storing, in said LCS storage unit, a plurality of rules for processing a data set;
    receiving, via said LCS communications port, a first data set that includes data defining first content;
    said LCS determining whether said first content belongs to a different LCS domain than said first LCS domain;
    said LCS excluding from said first LCS domain said first content when said LCS determines that said first content belongs to said different LCS domain;
    said LCS domain processor determining, from said first data set, a first data set status value of said first data set to be at least one of unsecure, secure, and legacy;
    said LCS determining, using said first data set status value, which of a set of rules to apply to process said first data set;
    and said LCS determining, at least in part from rights associated with an identification associated with a prompt received by said LCS for said first content, a quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy;
    said LCS transmitting said first content at the determined quality level.

In this claim language, "an LCS domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS," the claim itself provides sufficient context for understanding the term "devices outside [an] LCS," particularly when read in light of subsequent recitals regarding LCS domains that are distinct from one another."   Defendants' proposal of "devices not controlled by the LCS domain processor" would introduce potential redundancy, confusion, or inconsistency.  The specification disclosure cited by Defendants at the October 20, 2021 hearing does not compel otherwise.  *See* '295 Patent at 14:48–63 ("After watermarking, the content may be permitted to exit the LCS

Domain, and may be exported to a device outside the LCS Domain, including for example, a rewritable media, a viewer, player, or other receiver.").

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"devices outside [an] LCS"** to have its **plain meaning**.

### 35.  "content data set"

| **"content data set"** ('246 Patent, Claim 1) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite |

(Dkt. #30, Ex. A, at p. 13; Dkt. #41-1, at p. 42).

### A.  The Parties' Positions

Plaintiffs argue that "[t]he term 'content data set' speaks for itself against Defendants' assertion" and "is supported throughout the specification."  (Dkt. #37, at p. 45).

Defendants respond that "the '246 patent does not provide any explanation as to what "content data set" means, or what data is being transmitted or transferred by the SECD."  (Dkt. #39, at pp. 46–47).  Defendants also argue that "[t]he '246 patent does not distinguish between 'data sets' and 'content data sets' or provide any insight as to the different meaning associated with these terms."  (*Id.*, at p. 47).

Plaintiffs reply that "Grande contends the term is indefinite because only 'data set' is described in the specification, but the specification shows at least some data sets define 'content.'" (Dkt. #40, at p. 17) (citations omitted).

At the October 20, 2021 hearing, Plaintiffs reiterated that a "content data set" is simply a type of data set.

### B. Analysis

Claim 1 of the '246 Patent recites (emphasis added):

1.   A local content server system (LCS) for creating a secure environment for digital content, comprising:
    a) a communications port for connecting the system via a network to at least one Secure Electronic Content Distributor (SECD), said SECD storing a plurality of data sets, receiving a request to transfer at least one *content data set*, and transmitting the at least one *content data set* in a secured transmission;
    b) a rewritable storage medium whereby content received from outside the LCS is stored and retrieved;
    c) a domain processor that imposes rules and procedures for content being transferred between the LCS and devices outside the LCS; and
    d) a programmable address module programmed with an identification code uniquely associated with the LCS; and
    said domain processor permitting the LCS to receive digital content from outside the LCS provided the LCS first determines that the digital content being delivered to the LCS is authorized for use by the LCS and if the digital content is not authorized for use by the LCS, accepting the digital content at a predetermined quality level, said predetermined quality level having been set for legacy content.

The various recitals regarding "digital content" provide context for understanding the term "content data set" as used in this claim.  The specification provides further context by referring to "a data set (e.g., a song or other content)" and "[a] digital data set (e.g., a song)." '246 Patent at 15:1–2 & 15:61.  Moreover, the specification discloses that "[t]he term 'content' is used to refer generally to digital data, and may comprise video, audio, or any other data that is stored in a digital format."  *Id.* at 7:60–62.

On balance, Defendants do not meet their burden to show that the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129; *see Sonix*, 844 F.3d at 1377.   Defendants present no alternative proposed construction.

The Court therefore hereby construes **"content data set"** to have its **plain meaning**.

### 36.  **"legacy" and "legacy content"**

| **"legacy"**<br>('295 Patent, Claim 13)<br><br>**"legacy content"**<br>('246 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | Digital content that was commercially distributed before the advent of watermarking systems. |

(Dkt. #30, Ex. A, at p. 13; Dkt. #41-1, at p. 43).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants' proposal is another effort to read into the claims an example from the specification."  (Dkt. #37, at p. 46).

Defendants respond that "the '295 or '246 patents provide an express definition of 'legacy content,' which is adopted in Grande's proposed construction."  (Dkt. #39, at p. 48). Defendants argue that "[t]he *only* definition of 'legacy content' in the patents is not describing a sample embodiment, but is describing 'the present invention.'"  (*Id.*).

Plaintiffs reply:

Grande references (but does not cite) a specific "Sample Embodiment" of the specification, "Renewability," which merely states that "operation of the system

> of the present invention is complicated" by what the embodiment calls "'legacy' digital content" that is "already in the hands of consumer." ('246 Patent at 17:38–67). The term "present invention" applies to "operation," *not* to "legacy (content)." There is no indication that "legacy (content)" *must* be construed this way for *all* embodiments.

(Dkt. #40, at p. 17).

At the October 20, 2021 hearing, Plaintiffs argued that the definition cited by Defendants appears in a description of a sample embodiment or exemplary types of watermarks. *See* '295 Patent at 17:32–58 & 18:26–37. Plaintiffs also highlighted that the "Definitions" section of the specification contains no definition for "legacy."

### B.  Analysis

The '295 Patent and the '246 Patent disclose:

> The operation of the system of the present invention is complicated, however, by the presence, of "legacy" digital content which is already in the hands of consumer (*that is*, digital content that was commercially distributed before the advent of watermarking systems) because legacy content will continue to be present in the future.

'295 Patent at 18:26–31 (emphasis added); '246 Patent at 17:54–59 (same).

In this disclosure, the phrase "that is" is a literal translation equivalent of "i.e.," and the Federal Circuit has recognized that "i.e." usually signals a definition. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) ("[U]se of 'i.e.' signals an intent to define the word to which it refers."); *see also Rembrandt Wireless Techs., LP v. Samsung Elecs. Co., Ltd.*, 853 F.3d 1370, 1376 (Fed. Cir. 2017) ("Indeed, the term 'i.e.' is Latin for id est, which means 'that is.'"). Despite Plaintiffs' arguments to the contrary, a fair reading of the above-reproduced disclosure is that the patentee defined the term "legacy" for purposes of these patents as a whole, not merely for purposes of particular embodiments. *See id.*

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"legacy"** | **"commercially distributed before the advent of watermarking systems"** |
| **"legacy content"** | **"digital content that was commercially distributed before the advent of watermarking systems"** |

### 37.  "identification associated with a prompt"

| **"identification associated with a prompt"** ('295 Patent, Claim 13) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Identification in response to a request. |

(Dkt. #30, Ex. A, at p. 13; Dkt. #41-1, at p. 46).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants' proposal is another effort to read into the claims an example from the specification."  (Dkt. #37, at p. 47).

Defendants respond:

The words "identification associated with a prompt" do not appear in the '295 patent outside of claim 13.  Nor does the word "associated with a prompt" appear in the '295 patent.  Without any guidance from the specification as to what "associated with" means, a POSITA would understand this claim limitation to mean an "identification in response to a request."  This construction is consistent with the plain and ordinary meaning of the claim language.

(Dkt. #39, at p. 48).

Plaintiffs reply that Defendants "cite[] no expert declaration or any other extrinsic evidence to support [their] conclusion" and "ignore[] Blue Spike's arguments." (Dkt. #40, at p. 18).

At the October 20, 2021 hearing, Plaintiffs argued that "prompt" requires no construction.

### B. Analysis

Claim 13 of the '295 Patent recites, in relevant part (emphasis added):

13.     A method for using a local content server system (LCS), said LCS comprising an LCS communications port; an LCS storage unit for storing digital data in non-transitory form; an LCS domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS, thereby defining a first LCS domain; and a programmable address module programmed with an LCS identification code uniquely associated with said LCS domain processor; comprising:
     storing, in said LCS storage unit, a plurality of rules for processing a data set;
     receiving, via said LCS communications port, a first data set that includes data defining first content;
     . . .
     and said LCS determining, at least in part from rights associated with an *identification associated with a prompt* received by said LCS for said first content, a quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy;
     said LCS transmitting said first content at the determined quality level.

The word "prompt" does not appear in the '295 Patent outside of the claims.  The word "prompt" appears in the disputed term in above-reproduced Claim 13 and also appears in Claim 1, which recites "wherein said LCS is configured to determine, at least in part from rights associated with a user identification associated with a *prompt* received by said LCS for said first content, a quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy" and "wherein said LCS is configured to transmit said first content at the determined quality level in response to said *prompt*."

On balance, this claim language in Claims 1 and 13 of the '295 Patent demonstrates that the patentee used "prompt" in this context to refer to a request.  As to Defendants' proposal of "in response" to a request, however, Defendants have not sufficiently supported introducing such a limitation as to the present disputed term, which recites more generally "identification *associated with* a prompt."

The Court therefore hereby construes **"identification associated with a prompt"** to mean **"identification associated with a request."**

### 38.  "quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy"

| "quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy" ('295 Patent, Claim 13) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite |

(Dkt. #30, Ex. A, at p. 14; Dkt. #41-1, at p. 48).

### A.  The Parties' Positions

Plaintiffs argue that this disputed term "speaks for itself against Defendants' assertion [of indefiniteness]," and "the claim language is clear to one skilled in the art on its face."  (Dkt. #37, at p. 48).

Defendants respond: "While the patent discusses 'standard quality,' 'low quality,' and 'high quality' content, there is no discussion as to what a 'secure,' 'unsecure,' or 'legacy' quality level refers.  This claim limitation is so ambiguous that the claim fails to inform a POSITA with reasonable certainty as to the scope of the claim and is therefore indefinite."  (Dkt. #39, at p. 49) (citation omitted).  Defendants submit: "Adding to the ambiguity is the fact that claim 13 of the

'295 patent discusses 'secure,' 'unsecure,' and 'legacy' in *two separate and distinct ways*: (1) 'secure,' 'unsecure,' and 'legacy' *quality level* ('295 patent at 20:22–28); and (2) 'secure,' 'unsecure,' and 'legacy' *status value* (*id.* at 20:17–19)."  (Dkt. #39, at p. 49).  Defendants also cite Figure 4 of the '295 Patent.  (*See id.*, at pp. 49–50).  "Further," Defendants ague, "this claim limitation is indefinite because it would have been entirely unclear to a POSITA what it means for the LCS to 'determine' a 'secure,' 'unsecure,' or 'legacy' 'quality level' from 'rights associated with an identification associated with a prompt.'"  (*Id.*, at p. 50).

Plaintiffs reply that Defendants, having presented arguments regarding the term "legacy" (above), cannot be heard to argue that this term is not understandable.  (Dkt. #40, at p. 18). Plaintiffs also argue: "Descriptions of 'quality levels' associated with 'status values' constitute intrinsic evidence of described 'quality levels.'  Any associated 'status values' would logically be used to indicate the 'quality level' of the content to a computer system.  Grande's argument to separate the 'status value' quality levels from 'quality levels' is nonsensical."  (*Id.*).

At the October 20, 2021 hearing, Plaintiffs argued that the claim provides context, such that these levels or values could have been recited as "A," "B," and "C" and would have been just as readily understandable.  Plaintiffs urged that the claim instead labeling these levels or values as "unsecure," "secure," and "legacy" does not give rise to any indefiniteness.

### B.  Analysis

Claim 13 of the '295 Patent recites (emphasis added):

13.   A method for using a local content server system (LCS), said LCS comprising an LCS communications port; an LCS storage unit for storing digital data in non-transitory form; an LCS domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS, thereby defining a first LCS domain; and a programmable address module programmed with an LCS identification code uniquely associated with said LCS domain processor; comprising:

> storing, in said LCS storage unit, a plurality of rules for processing a data set;
>
> receiving, via said LCS communications port, a first data set that includes data defining first content;
>
> said LCS determining whether said first content belongs to a different LCS domain than said first LCS domain;
>
> said LCS excluding from said first LCS domain said first content when said LCS determines that said first content belongs to said different LCS domain;
>
> said LCS domain processor determining, from said first data set, a *first data set status value of said first data set to be at least one of unsecure, secure, and legacy*;
>
> said LCS determining, using said first data set status value, which of a set of rules to apply to process said first data set;
>
> and said LCS determining, at least in part from rights associated with an identification associated with a prompt received by said LCS for said first content, a *quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy*;
>
> said LCS transmitting said first content at the determined quality level.

Disclosures in the specification explain that a quality level can be adjusted depending on whether content is "secure," "unsecure," or "legacy."  The term "legacy" is discussed and construed separately, above.  The terms "secure" and "unsecure" are sufficiently clear in the context of disclosures in the specification.  *See* '295 Patent at 17:33–58; *see also id.* at 8:44–64 (describing "standard quality," "low quality," and "high quality" content); *id.* at Fig. 4 (flow chart illustrating that quality can be modified depending on watermark status).  The separate above-emphasized recital regarding "status value" does not compel otherwise.  For example, Defendants do not show that a "status value" and a "quality level" cannot both be unsecure, secure, or legacy.

On balance, Defendants do not meet their burden to show that the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129; *see Sonix*, 844 F.3d at 1377.  Defendants present no alternative proposed construction.

The Court therefore hereby construes **"quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy"** to have its **plain meaning**.

**39. "first data set status value of said first data set to be at least one of unsecure, secure, and legacy"**

| **"first data set status value of said first data set to be at least one of unsecure, secure, and legacy"** ('295 Patent, Claim 13) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite.<br><br>Alternatively, if construed:<br><br>Setting a first data set status value to one of unsecure, secure, and legacy.<br><br>"unsecure" means a data set having a watermark that is unverified or mismatched.<br><br>"secure" means a data set having a watermark that is verified.<br><br>"legacy" [means] a data set that does not have a watermark. |

(Dkt. #30, Ex. A, at p. 14; Dkt. #41-1, at p. 50).

## A. The Parties' Positions

Plaintiffs argue that "Defendants offer no intrinsic or extrinsic evidence to support their indefiniteness assertion," and if the term is found not indefinite "Defendants again seek to limit the claims based on exemplary embodiments from the specification." (Dkt. #37, at pp. 49 & 50).

Defendants respond that "[a]gain, what it means to have an 'unsecure,' 'secure,' and 'legacy' status value is not explained in the '295 patent," and "[t]his language is particularly

confusing given that claim 13 of the '295 patent discusses both secure, unsecure, and legacy status value *and* quality level."  (Dkt. #39, at p. 51) (emphasis modified).

Plaintiffs reply by citing their arguments as to the "legacy" and "quality level . . ." terms discussed above.  (Dkt. #40, at pp. 18–19).

At the October 20, 2021 hearing, Plaintiffs argued that the claim provides context, such that these values could have been recited as "A," "B," and "C" and would have been just as readily understandable.  Plaintiffs urged that the claim instead labeling these values as "unsecure," "secure," and "legacy" does not give rise to any indefiniteness.

### B.  Analysis

For substantially the same reasons discussed above as to the "quality level . . ." term, Defendants do not meet their burden to show that the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129; *see Sonix*, 844 F.3d at 1377.

As to Defendants' alternative proposed constructions, Plaintiffs argue: "Grande now proposes constructions for terms it contends are indefinite with regard to the immediately preceding claim terms.  This is improper, and Grande's proposals should be rejected."  (Dkt. #40, at p. 19).  The term "legacy" is separately discussed and construed, above, and Defendants' proposals here for "secure" and "unsecure" are not consistent with disclosure in the specification. For example, the specification refers to a "secure" watermark as being "readable only by a single member of a class of devices."  '295 Patent at 17:33–58; *see id.* at 8:28–43; *see also id.* at 11:10–25 & Fig. 4.  This does not necessarily define the term "secure" but demonstrates that Defendants' proposed construction lacks sufficient support.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"first data set status value of said first data set to be at least one of unsecure, secure, and legacy"** to have its **plain meaning**.

### 40.  "Secure Electronic Content Distributor (SECD)"

| "Secure Electronic Content Distributor (SECD)" ('246 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary<br><br>Alternatively:<br>    "An entity, device or software application which can validate a transaction with a LCS, process a payment, and deliver digital content securely to a LCS" | An entity, device or software application which can validate a transaction with an LCS, process a payment, and deliver digital content securely to an LCS. |

(Dkt. #30, Ex. A, at p. 15; Dkt. #37, at p. 51; Dkt. #41-1, at p. 52).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants' proposal is another effort to read into the claims an example from the specification."  (Dkt. #37, at p. 51).  Alternatively, Plaintiffs submit:

> To the extent the court finds the "DEFINITIONS" section controlling, Blue Spike proposes the definition used in this section: "An entity, device or software application which can validate a transaction with a LCS, process a payment, and deliver digital content securely to a LCS." (7:54–57).

(Dkt. #37, at p. 51).

Defendants respond that "the patentee, acting as its own lexicographer, conveniently provided a definition section that defines this language."  (Dkt. #39, at p. 52) (citing '246 Patent at 7:51–10:30).

Plaintiffs reply that "Grande ignores Blue Spike's numerous citations (Dkt. 37 at 51) indicating the 'DEFINITIONS' section merely indicates example definitions that should not be imparted into 'Secure Electronic Content Distributor (SECD).'"  (Dkt. #40, at p. 19) (citation omitted).

### B.  Analysis

The '295 Patent includes a Definitions section that discloses:

> Secure Electronic Content Distributor (SECD): An entity, device or software application which can validate a transaction with a LCS, process a payment, and deliver digital content securely to a LCS.  In cryptographic terms, the SECD acts as a "certification authority" or its equivalent. SECDs may have differing arrangements with consumers and providers of value-added information.  (The term "content" is used to refer generally to digital data, and may comprise video, audio, or any other data that is stored in a digital format).

'295 Patent at 8:1–9; *see id.* at 7:63 ("DEFINITIONS").

The patentee thus "clearly set forth a definition of the disputed claim term in . . . the specification," *CCS Fitness*, 288 F.3d at 1366, and "[i]n such cases, the inventor's lexicography governs," *Phillips*, 415 F.3d at 1316.

Plaintiffs argue that this Definitions section relates to particular embodiments, but the cited statement appears at the end of the Summary section and states: "We now define components of the preferred embodiments for methods, systems, and devices."  *Id.* at 7:60–61.  Read fairly, this statement affirms that the Definitions section relates to the entire specification.  *See id.*

The Court thus having rejected Plaintiffs' argument that this "Definition" is merely an example, the Court adopts Plaintiffs' alternative proposed construction, which is substantially identical to the construction proposed by Defendants.

The Court therefore hereby construes **"Secure Electronic Content Distributor (SECD)"** to mean **"an entity, device, or software application which can validate a transaction with a LCS, process a payment, and deliver digital content securely to a LCS."**

### 41.  "secured transmission"

| "secured transmission" ('246 Patent, Claim 1) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendant's Proposed Construction** |
| No construction necessary | Transmission of content using a cryptographic technique. |

(Dkt. #30, Ex. A, at p. 15; Dkt. #41-1, at p. 53).

### A.  The Parties' Positions

Plaintiffs argue that "Defendants merely cite 'sample embodiments' and a 'preferred embodiment' of the specification in support of their construction . . . ."  (Dkt. #37, at p. 52).

Defendants respond that "[t]he '246 patent discloses that a 'secure' transmission is purportedly accomplished through cryptographic and steganographic protocols," and "[t]his is the only relevant disclosure in the '246 patent and controls the construction of this claim language."  (Dkt. #39, at p. 53) (citations omitted).  Defendants also argue that "Blue Spike does not give a single example from the '246 patent of a 'secured transmission' that does not involve using a cryptography."  (*Id.*)

Plaintiffs reply that "the specification goes out of its way to indicate the use of cryptography is merely an example—'*sample* embodiment,' 'perhaps,' 'using digital security that is known in the art of electronic commerce'—and is not to be the *only* embodiment or a definition by the Applicant."  (Dkt. #40, at p. 19).

### B.  Analysis

Claim 1 of the '246 Patent recites (emphasis added):

1.   A local content server system (LCS) for creating a secure environment for digital content, comprising:

a) a communications port for connecting the system via a network to at least one Secure Electronic Content Distributor (SECD), said SECD storing a plurality of data sets, receiving a request to transfer at least one content data set, and transmitting the at least one content data set in a *secured transmission*;

b) a rewritable storage medium whereby content received from outside the LCS is stored and retrieved;

c) a domain processor that imposes rules and procedures for content being transferred between the LCS and devices outside the LCS; and

d) a programmable address module programmed with an identification code uniquely associated with the LCS; and

said domain processor permitting the LCS to receive digital content from outside the LCS provided the LCS first determines that the digital content being delivered to the LCS is authorized for use by the LCS and if the digital content is not authorized for use by the LCS, accepting the digital content at a predetermined quality level, said predetermined quality level having been set for legacy content.

The specification discloses:

Related situations range from the ability to provably establish the "existence" of a virtual financial institution to determining the reliability of an "electronic stamp." The present invention seeks to improve on the prior art by describing optimal combinations of *cryptographic and steganographic protocols* for "trusted" verification, confidence and non-repudiation of digitized representations of perceptually rich information of the actual seller, vendor or other associated institutions which may not be commercial in nature (confidence building with logo's such as the SEC, FDIC, Federal Reserve, FBI, etc. apply).

'246 Patent at 4:3–13 (emphasis added); *see also id.* at 7:54–62 ("deliver digital content securely to a LCS"); *id.* at 13:4–18 ("Path 1 [in Fig. 1] depicts a secure distribution of digital content from

a SECD to a LCS.  The content can be secured during the transmission using one or more 'security protocols' (e.g., encryption or scrambling).").

Encryption, however, is merely an example.  Indeed, even the disclosure cited by Defendants regarding "cryptographic and steganographic" protocols weighs against Defendants' proposed construction because steganography is disclosed as distinct from cryptography.  The disclosure of "e.g., encryption or scrambling" further undermines Defendants' proposal of requiring cryptography.  At the October 20, 2021 hearing, Defendants submitted that they intended the word "encrypted" to be an "umbrella" encompassing many different types of secured transmission, but Defendants acknowledged at the hearing that the word "encrypted" might be read as having a narrower meaning than Defendants intended.

Based on all of the foregoing, the Court hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"secured transmission"** to have its **plain meaning**.

### 42. "said predetermined quality level having been set for legacy content"

| **"said predetermined quality level having been set for legacy content"** (’246 Patent, Claim 1) ||
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | The quality level having been established based on a finding that the content is legacy content. |

(Dkt. #30, Ex. A, at p. 15; Dkt. #41-1, at pp. 54–55).

### A.  The Parties' Positions

Plaintiffs argue that "the claim language is clear to one skilled in the art on its face," and "Defendants' words 'based on a finding' occur nowhere in the specification."  (Dkt. #37, at p. 54).

Defendants respond that "[t]he '246 patent does not disclose what it means to have a 'predetermined quality level' or how a 'quality level' is 'set for legacy content.'"  (Dkt. #39, at p. 53).  Defendants also argue: "Grande's use of 'based on a finding' is appropriate as the 'quality level' must be set after a determination (*i.e.*, a finding) is made by the domain processor that the content is 'legacy' content.  Based on this finding by the domain processor, the 'quality level' can be set."  (*Id.*, at p. 54).

Plaintiffs reply that "Blue Spike rejects the entirety of Grande's proposal," and "Grande ignores Blue Spike's arguments."  (Dkt. #40, at p. 19).

### B.  Analysis

Claim 1 of the '246 Patent recites (emphasis added):

1.  A local content server system (LCS) for creating a secure environment for digital content, comprising:
    . . .
    said domain processor permitting the LCS to receive digital content from outside the LCS provided the LCS first determines that the digital content being delivered to the LCS is authorized for use by the LCS and if the digital content is not authorized for use by the LCS, accepting the digital content at a predetermined quality level, *said predetermined quality level having been set for legacy content*.

Defendants rely on the claim language as purported support for Defendants' proposal of "based on a finding," arguing that a finding is made as to whether the content is legacy content. Defendants' proposal, however, could be read as meaning the quality level *itself* (not the application of the quality level) is based on determining that the content is legacy content.  Such

an interpretation would be inconsistent with the recital that the quality level is "predetermined." Also, the specification discusses using a "degraded" quality level.  *See* '246 Patent at 13:56–65.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary.  *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *Bayer*, 989 F.3d at 977–79.

The Court accordingly hereby construes **"said predetermined quality level having been set for legacy content"** to have its **plain meaning**.

### 43.  "said LCS determining, at least in part from rights associated with an identification associated with a prompt received by said LCS for said first content, a quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy"

| "said LCS determining, at least in part from rights associated with an identification associated with a prompt received by said LCS for said first content, a quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy" ('295 Patent, Claim 13) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | Indefinite |

(Dkt. #30, Ex. A, at p. 16; Dkt. #41-1, at pp. 56–57).

### A.  The Parties' Positions

Plaintiffs argue that "[t]he term speaks for itself against Defendants' assertion [of indefiniteness]," and "Defendants have already proposed constructions for terms within this phrase . . . ."  (Dkt. #37, at p. 55).

Defendants respond as to this term together with the term "quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy," which is discussed above.  (*See* Dkt. #39, at p. 48–50).

At the October 20, 2021 hearing, Defendants argued that the specification lacks any disclosure regarding this recited "determining."

### B.  Analysis

For the same reasons discussed above as to the term "quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy," Defendants do not meet their burden to show that the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Nautilus*, 134 S. Ct. at 2129; *see Sonix*, 844 F.3d at 1377.  Defendants present no alternative proposed construction.

The Court therefore hereby construes **"said LCS determining, at least in part from rights associated with an identification associated with a prompt received by said LCS for said first content, a quality level at which to transmit said first content, wherein said quality level is one of at least unsecure, secure, and legacy"** to have its **plain meaning**.

44. **"domain processor"**

| **"domain processor"** (\'246 Patent, Claim 1) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f).<br><br>In the alternative, if any construction is deemed necessary, the construed term should include the full phrase "a domain processor that imposes rules and procedures for content being transferred between the LCS and devices outside the LCS." To the extent the Court determines that § 112(f) applies to this claim term, the function is to impose rules and procedures for content being transferred between the LCS and devices outside the LCS, and the associated structure is a microprocessor and equivalents to this structure. | The claimed function:<br>    imposes rules and procedures for content being transferred between the LCS and devices outside the LCS and permits the LCS to receive digital content from outside the LCS.<br><br>The corresponding structure:<br>    Not disclosed. Therefore, the term is indefinite. |

(Dkt. #30, Ex. A, at p. 17; Dkt. #41-1, at pp. 58–59).

## A.  The Parties' Positions

Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term.  (Dkt. #37, at p. 56).  Plaintiffs submit that "[a] 'processor' is, itself, understood to be structure in the computer arts."  (*Id.*, at pp. 56–57).

Defendants respond that "the limitation 'domain processor' is in a format consistent with traditional means-plus-function claim limitations," and "[t]he word 'processor' in the context [of] the claims is a nonce word that essentially replaces the word 'means.'"  (Dkt. #39, at pp. 54 & 55).  Defendants argue that the extrinsic definition of "processor" cited by Plaintiffs was not

timely disclosed and "the general definition of 'processor' does not provide any insight into the structure of a 'domain processor.'"  (*Id.*, at p. 57) (citation omitted).  Defendants also argue that "[t]he[] functions are not typical functions that are performed by generic off the shelf components, but are instead specialized functions relating to the claimed LCS Domain." (*Id.*, at p. 55).  Further, Defendants argue that "the specification of the '246 patent not only lacks 'adequate' structure, but is *completely devoid* of any structure associated with the functions of imposing rules and procedures for content being transferred between the LCS and devices outside the LCS and permitting LCS to receive digital content," and "[t]he specification does not provide *any* structure relating to the 'domain processor,' and in fact never mentions the 'domain processor.'"  (*Id.*, at p. 56).

Plaintiffs reply that "[m]ost case law in this District, supported by the Federal Circuit, supports the position that 'processor' connotes sufficient structure."  (Dkt. #40, at p. 20).  Further, Plaintiffs distinguish the *St. Isidore* case cited by Defendants, arguing for example that "claim 1 *does* 'describe how the processor[] interact[s] with . . . other limitations in the claim to achieve [its] objectives.'"  (*Id.*) (quoting *St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *14 (E.D. Tex. Sept. 19, 2016)).

At the October 20, 2021 hearing, Defendants argued that the "domain processor" is not a general-purpose processor but rather is part of the LCS domain and determines whether content can enter the LCS.  Defendants argued that the "domain processor" is not an "off-the-shelf" processor.  *See GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126, 2016 WL 212676 (D. Ariz. Jan. 19, 2016).  Plaintiffs responded that it is unclear why Defendants are focusing on the nature of the processor.  Plaintiffs reiterated that the word "processor" generally connotes structure, urging that this "domain processor" is no exception.

### B.  Analysis

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that

§ 112, para. 6 does not apply."  *Williamson*, 792 F.3d at 1348 (citations and internal quotation

marks omitted).  "When a claim term lacks the word 'means,' the presumption can be overcome

and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite

sufficiently definite structure or else recites function without reciting sufficient structure for

performing that function."  *Id.* at 1349 (citations and internal quotation marks omitted).

Claim 1 of the '246 Patent recites (emphasis added):

1.  A local content server system (LCS) for creating a secure environment for
digital content, comprising:
    a) a communications port for connecting the system via a network to at
least one Secure Electronic Content Distributor (SECD), said SECD storing a
plurality of data sets, receiving a request to transfer at least one content data set,
and transmitting the at least one content data set in a *secured transmission*;
    b) a rewritable storage medium whereby content received from outside the
LCS is stored and retrieved;
    c) a *domain processor* that imposes rules and procedures for content being
transferred between the LCS and devices outside the LCS; and
    d) a programmable address module programmed with an identification
code uniquely associated with the LCS; and
    said *domain processor* permitting the LCS to receive digital content from
outside the LCS provided the LCS first determines that the digital content being
delivered to the LCS is authorized for use by the LCS and if the digital content is
not authorized for use by the LCS, accepting the digital content at a
predetermined quality level, said predetermined quality level having been set for
legacy content.

Here, this "processor" term does not use any of the words identified by *Williamson* as a

"nonce" word lacking structure.  *See id.*  Although the term "processor" may refer to a broad

class of structures, this breadth does not necessarily render the term non-structural.  *See Skky,*

*Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (finding "wireless device means"

not a means-plus-function term, noting that "it is sufficient if the claim term is used in common

parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a

broad class of structures and even if the term identifies the structures by their function") (quoting *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013)).

Defendants cite the Court's decision in *St. Isidore*, which found that the presumption against means-plus-function treatment under 35 U.S.C. § 112, ¶ 6 had been rebutted because "[i]n the context of the 'processor configured to . . .' terms, . . . each processor is defined only by the function that it performs." *St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *14 (E.D. Tex. Sept. 19, 2016). *St. Isidore* itself noted that "[t]he Court has typically found 'processor' to connote sufficient structure to avoid the application of § 112, ¶ 6 in different circumstances." *Id.*, at *15. The Court's analysis in *SyncPoint* is applicable. *See SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2:15-CV-247, 2016 WL 55118, at *18–*21 (E.D. Tex. Jan. 5, 2016). Also, the Federal Circuit recently reinforced this analysis, finding that a "processing" term connoted structure:

> As used in the claims of the '591 patent, the term "digital processing unit" clearly serves as a stand-in for a "general purpose computer" or a "central processing unit," each of which would be understood as a reference to structure in this case, not simply any device that can perform a particular function.

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020).

The Court therefore hereby expressly rejects Defendants' argument that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. Defendants present no alternative proposed construction.

The Court accordingly hereby construes **"domain processor"** to have its **plain meaning**.

**45.  "domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS"**

| **"domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS"** ('295 Patent, Claim 13) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f). In the alternative, to the extent the Court determines that § 112(f) applies to this claim term, the function is to impose a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS, and the associated structure is a microprocessor and equivalents to this structure. | The claimed function:     imposes a plurality of rules and procedures for content being transferred between an LCS and devices outside of the LCS. The corresponding structure:     Not disclosed. Therefore, the term is indefinite. |

(Dkt. #30, Ex. A, at p. 18; Dkt. #41-1, at pp. 59–60).

## A.  The Parties' Positions

Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term.  (Dkt. #37, at p. 58).  Plaintiffs submit that "[t]he term includes 'processor,' which is, itself, understood to be structure in the computer arts."  (*Id.*)

Defendants respond that "this limitation reciting 'domain processor' is in a format consistent with traditional means-plus-function claim limitations," and "[t]he word 'processor' in the context of Blue Spike's claims is a nonce word that essentially replaces the word "means.'"  (Dkt. #39, at p. 58) (citation omitted).  Defendants also argue that "the specification of the '295

patent not only lacks 'adequate' structure, but is *completely devoid* of any structure associated with the claimed functions relating to the LCS domain processor." (*Id.*, at p. 59).

Plaintiffs reply by citing their arguments as to the term "domain processor," which is discussed above. (*See* Dkt. #40, at p. 20).

### B. Analysis

This "domain processor . . ." term presents substantially the same dispute as discussed above regarding the term "domain processor," and the Court reaches the same conclusion for the same reasons. The Court therefore hereby expressly rejects Defendants' argument that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. Defendants present no alternative proposed construction.

The Court accordingly hereby construes **"domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS"** to have its **plain meaning**.

**46.  "said LCS domain processor determining, from said first data set, a first data set status value of said first data set to be at least one of unsecure, secure, and legacy"**

| "said LCS domain processor determining, from said first data set, a first data set status value of said first data set to be at least one of unsecure, secure, and legacy" ('295 Patent, Claim 13) ||
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Contrary to Defendant's assertion, this claim term is not a means-plus-function clause and thus does not invoke the construction requirements associated with 35 U.S.C. § 112(f).<br><br>In the alternative, to the extent the Court determines that § 112(f) applies to this claim term, the function is determining, from said first data set, a first data set status value of said first data set to be at least one of unsecure, secure, and legacy, and the associated structures are those of the "domain processor" as described above. | The claimed function:<br>    determining, from said first data set, a first data set status value of said first data that is capable of being at least one of unsecure, secure, or legacy, by assessing the watermark, or lack of a watermark, of the data set.<br><br>The corresponding structure:<br>    Not disclosed. Therefore, the term is indefinite. |

(Dkt. #30, Ex. A, at p. 19; Dkt. #41-1, at pp. 61–62).

## A.  The Parties' Positions

Plaintiffs argue that Defendants cannot overcome the presumption against means-plus-function treatment for this non-means term.  (Dkt. #37, at pp. 59–60).  Plaintiffs submit that "[t]he term includes 'processor,' which is, itself, understood to be structure in the computer arts." (*Id.*, at 60.)

Defendants respond as to this term together with the term "domain processor that imposes a plurality of rules and procedures for content being transferred between said LCS and devices outside said LCS," which is discussed above.  (*See* Dkt. #39, at pp. 57–60).  Defendants argue that the extrinsic definition of "processor" cited by Plaintiffs was not timely disclosed and

"the general definition of 'processor' does not provide any insight into the structure of a 'LCS domain processor.'"  (*Id.*, at pp. 59–60) (citation omitted).

Plaintiffs reply by citing their arguments as to the term "domain processor," which is discussed above.  (*See* Dkt. #40, at p. 20).

### B. Analysis

This ". . . domain processor . . ." term presents substantially the same dispute as discussed above regarding the term "domain processor," and the Court reaches the same conclusion for the same reasons.  The Court therefore hereby expressly rejects Defendants' argument that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.  Defendants present no alternative proposed construction.

The Court accordingly hereby construes **"said LCS domain processor determining, from said first data set, a first data set status value of said first data set to be at least one of unsecure, secure, and legacy"** to have its **plain meaning**.

### CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**IT IS SO ORDERED.**
**SIGNED this 2nd day of November, 2021.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE